UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MIRIAM E. DELGADO | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO.: |
| | : | 3:11-cv-01735-VAB |
| v. | : | |
| | : | |
| CITY OF STAMFORD | : | NOVEMBER 2, 2015 |
| | : | |
| Defendant. | : | |

**RULING ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff, Miriam E. Delgado ("Plaintiff"), filed this action against Defendant, the City of

Stamford, Connecticut ("Defendant" or "the City"), alleging (1) employment discrimination on

the basis of her sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the

Connecticut Fair Employment Practices Act ("CFEPA"); (2) employment discrimination on the

basis of her national origin in violation of Title VII and CFEPA; (3) hostile work environment on

the basis of her sex and national origin in violation of Title VII and CFEPA[1]; and (4) retaliation

in violation of Title VII and CFEPA.  Defendant moves for summary judgment as to all claims.

For the following reasons, the motion is GRANTED IN PART AND DENIED IN PART.

---

[1] The Complaint does not expressly claim hostile work environment, and it certainly is not clear from the Complaint that any hostile work environment claim would be based upon national-origin-based harassment.  *See* Compl. at 8, ECF No. 1.  The Complaint does, however, claim "employment discrimination on the basis of . . . national origin and/or sexual harassment," *Id.* ¶ 59, and the parties briefed hostile work environment in terms of sex-based and national-origin-based harassment.  The Court will infer that Plaintiff pled hostile work environment on the basis of sex-based and national-origin-based harassment.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) ("Although the complaint does not explicitly allege discrimination based on a hostile work environment, the complaint alleges 'continued harassment' and alleges facts from which we may infer pleading of hostile work environment claims . . . .").

## II.   FACTS

The facts set forth herein are undisputed unless otherwise indicated.[2]  Statements in Plaintiff's affidavit that are not contradicted by record evidence or Plaintiff's own deposition testimony are undisputed for purposes of this ruling.  *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion"); *e.g.*, *Ebert v. Holiday Inn*, No. 11 Civ. 4102 (ER), 2014 WL 349640, at *2 (S.D.N.Y. Jan. 31, 2014) ("[T]o the extent that the statements in the . . . Affidavits are not disputed . . . or contradicted by other evidence in the record or by the individuals' own deposition testimony, the Court will consider them in resolving" summary judgment motion).

### A.   Squad A

Plaintiff is a Spanish-speaking female of Puerto Rican descent.  Delgado Aff. ¶¶ 52, 143, ECF No. 94.  She began her employment with the City as a police officer in 1989.  Def.'s L.R. 56(a)1 Stmt., ECF No. 56 [hereinafter "Def.'s Stmt."] ¶ 1; Pl.'s L.R. 56(a)2 Stmt., ECF No. 65-1 [hereinafter "Pl.'s Stmt."] ¶ 1.  She worked in patrol until April 2005, when she was assigned to Squad A of the major crimes unit of the Bureau of Criminal Investigations ("BCI").  Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2; Delgado Aff. ¶ 9.  Plaintiff was the only woman in Squad A.  The parties agree that a Spanish-speaking woman is an asset to a crime investigation unit.  Def.'s Stmt. ¶ 44; Pl.'s Stmt. ¶ 44.  Plaintiff worked in Squad A until she was transferred to patrol in July 2010, and

---

[2] The Court reviewed Defendant's objections to Plaintiff's affidavits and Local Rule 56(a)2 Statement, as well as Plaintiff's response.  ECF Nos. 79, 80, 95.  Defendant argues that Plaintiff's affidavit and Local Rule 56(a)2 Statement are replete with statements that do not comply with the Federal Rules of Civil Procedure and this Court's Local Rules, including statements in Plaintiff's 56(a)2 Statement that do not specifically admit or deny statements in Defendant's 56(a)1 Statement, allegations or denials that are not supported by specific citations to the record, and allegations that are irrelevant or that contradict Plaintiff's earlier deposition testimony.  The Court agrees that some of the statements in Plaintiff's papers are irrelevant, contradicted by her own testimony, and/or non-compliant with applicable procedural rules.  While the Court appreciates Defendant's effort to identify precisely these defects, the Court will not enumerate them, but instead will set forth only relevant facts supported by the record.

her immediate supervisor throughout that period was Sergeant Paul Guzda, a male.  Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 3.

Two male officers worked in Squad A under Sgt. Guzda's supervision: Officer Michael DiBella and Officer Frank Laccona.  Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.  Sgt. Guzda, Officer DiBella, and Officer Laccona were friends who socialized outside of work and vacationed together.  Delgado Aff. ¶ 37; DiBella Dep. at 108-09; Laccona Dep. at 66; Guzda Dep. at 70-71.  For a time, Plaintiff also had friendly relationships with Sgt. Guzda, Officer DiBella, and Officer Laccona.  Delgado Dep. at 65, ECF No. 57-1.  She sometimes ate lunch with them while at work, and had dinner and drinks with them at a restaurant one Christmas.  *Id.* at 67-68.  Plaintiff had a good working relationship with Sgt. Guzda until July 2009.  *See id.* at 34, 55-56.

At the time that Plaintiff transferred from Squad A to patrol, Sgt. Guzda reported to Lieutenant James Matheny, who was commander of BCI.  *See* Matheny Dep. at 15.  Lt. Matheny in turn reported to Captain Conklin.  *See id.* at 17, 28, 68, 99.

### B.   Plaintiff's 2008 Complaint & Resolution

In 2008, Plaintiff heard officers making sexual comments that made her feel uncomfortable.  Delgado Dep. at 36, ECF No. 57-6; Delgado Aff. ¶ 40-42.  Officers commented about oral sex and ejaculation, viewed obscene photographs on the Internet, and commented about women pictured in photographs, saying "I'd like to fuck her" and "You can't get your wife pregnant; how are you going to fuck her?"  Delgado Aff. ¶ 41.  One officer saw Plaintiff sitting nearby and said, "[T]here's a lawsuit waiting to happen."  *Id.* ¶ 43.  Sgt. Guzda allegedly said to Plaintiff, "You're going to learn a lot about the male anatomy working here."  *Id.* ¶ 45.

At some point before December 2008, Plaintiff complained to Captain Conklin about the sexual comments she was hearing.  Def.'s Stmt. ¶ 9; Pl.'s Stmt. ¶ 9; Delgado Aff. ¶ 47.  The

3

situation was resolved to Plaintiff's satisfaction, and her work atmosphere improved. Delgado Dep. at 37, ECF No. 57-6; Delgado Aff. ¶ 49. On December 5, 2008, Plaintiff signed a receipt representing that (1) she understood the City's revised sexual harassment policy, (2) she understood the process for filing a complaint, and (3) she believed she had been subjected to sexual harassment but that the "[s]ituation [had been] resolved by [her] Superior" prior to distribution of the revised sexual harassment policy and that "[n]o further action [was] required at [that] time." ECF No. 57-7.

The sexual harassment policy provided in part that "[i]f any employee believes that he or she has been subjected to sexual harassment . . . they should . . . Report the incident to Management within the City's Human Resources Division, or their supervisor. All incidents of sexual harassment or inappropriate sexual conduct should be reported immediately regardless of their seriousness. While employees are strongly encouraged to utilize the City's internal complaint procedure, they are not limited to its use." ECF No. 57-8 at 3.

### C.      Subsequent Sexual Comments and Behavior

In or about March 2010, Plaintiff allegedly began to hear officers making sexual comments again, including references to specific women having large breasts or tits, discussions in graphic detail about how two officers would have sex with one woman, use of the words "pussy" and "cunt," graphic discussions of sexual encounters that officers had, references to penis sizes, obscene jokes, comments that an officer has a "little pair" and "small club," and a story about an officer trying to have sex with a woman in a hot tub. Delgado Aff. ¶ 109. Sgt. Guzda told Plaintiff that by the time she left, she would "know the entire male anatomy." *Id.* Plaintiff never complained to anyone at the City about this conduct. Delgado Dep. at 49-50, ECF No. 57-6.

Plaintiff testified that Sgt. Guzda would call her into his office and, while changing out of his gym clothes after exercising, unzip his pants, tuck in his shirt, and then zip his pants back up while talking to Plaintiff. *See id.* at 142-43. She testified that Sgt. Guzda wore underpants when he did this. *Id.* at 143. According to Plaintiff, this happened two to three times per week from 2009 until immediately before Lt. Matheny became commander of BCI in April 2010. *Id.* at 143-44. The first time it happened, Plaintiff allegedly walked out of Sgt. Guzda's office and told Sgt. Guzda to let her know when he was finished. *Id.* at 143. Each time it happened thereafter, Plaintiff allegedly would walk away, and then Sgt. Guzda would come out of his office or call Plaintiff back into his office. *Id.* at 144-45. Plaintiff never complained about this alleged conduct to any supervisor or to human resources. *Id.* at 145. Plaintiff testified that she did not complain because she feared that she would be transferred if she complained. *See id.* Sgt. Guzda denies that these events ever occurred. *See* Guzda Dep. at 167-68.

### D.    Comments and Behavior Relating to National Origin

Throughout Plaintiff's tenure in Squad A, she allegedly heard Sgt. Guzda and Officer DiBella "constantly" make derogatory comments about Hispanic persons to her directly and in front of her. Delgado Aff. ¶ 144; Delgado Dep. at 86-87, ECF No. 57-1. Sgt. Guzda allegedly referred to Hispanics as "guats" (*i.e.*, Guatemalans), "Mexican," or "the taco guy" regardless of their national origin. Delgado Aff. ¶ 145. Sgt. Guzda allegedly asked Plaintiff, "Why do you only have two names and not four names like rest [*sic*] of the 'Guats'?" *Id.* ¶ 146. Sgt. Guzda sometimes said "mira, mira" (Spanish for "look, look") to get Plaintiff's attention. *Id.* ¶ 148. Sgt. Guzda said of cases involving Hispanics, "It's just another drunken Hispanic," "He's a drunk Guat," or "He's a drunk Mexi." *Id.* ¶ 149. On August 5, 2009, Sgt. Guzda assigned Plaintiff to a robbery case with a Hispanic victim. Plaintiff asked Sgt. Guzda why he assigned

her to the case.  Sgt. Guzda responded in a mocking voice, "Because they speaka da Spanish like you."  *Id.* ¶ 90.

Plaintiff testified that Officer DiBella constantly used the term "spic" to refer to Hispanic persons, said that "guats" are always drunk, said "if guats stop having illegal kids, we'd stop having such high taxes," and commented about an infanticide case, "What's the big deal, another Hispanic kills her kid."  *Id.* ¶ 150; *see* Delgado Dep. at 86-87, ECF No. 57-1.

Plaintiff never complained to anyone at the City about any of these comments.  *Id.* at 87.

**E.    Assignment of Cases**

Plaintiff complains that Sgt. Guzda unfairly assigned cases.  Delgado Aff. ¶ 52. Specifically, she complains that Sgt. Guzda gave interesting, high-profile cases that generated overtime opportunities to her male colleagues, and gave her cold cases, low-profile cases, and cases generating fewer overtime opportunities.  *See* Delgado Aff. ¶¶ 52-55; Opp. Br. at 7, 35, ECF No. 65.  Plaintiff's affidavit provides a long list of case assignments spanning five years. The Court will provide an abridged version.

Shortly after Plaintiff joined Squad A, Sgt. Guzda assigned her to a case involving an 11-week-old child with three skull fractures.  She worked with Sgt. Guzda and others to interview the parents and obtain the father's confession.  Delgado Aff. ¶¶ 30-32.

In October 2005, Sgt. Guzda assigned Plaintiff to a case involving the sexual assault of a 13-year-old Hispanic girl.  The suspect fled the country, but when the suspect returned to Stamford over two years later, the suspect was arrested and confessed.  Officers DiBella and Laccona did not work on this case.  *Id.* ¶ 56.

In October 2006, Sgt. Guzda assigned Plaintiff to a case where a woman was held at gunpoint, robbed, and sexually assaulted in front of her two children in the parking lot of a hotel.

Working with officers from another squad, Plaintiff tracked the perpetrator's use of credit cards stolen from the victim and helped obtain a photograph of the perpetrator taken by a video camera at a convenience store where the perpetrator used a stolen credit card. While Plaintiff was speaking to a bank representative about one of the stolen cards, the bank representative realized that the card was being used at that moment. Plaintiff immediately directed two officers to the location where the card was being used, and they apprehended the perpetrator. Plaintiff asked Officer DiBella for assistance while she was on the phone with the bank representative. Officer DiBella did not help her. *Id.* ¶ 57.

In December 2007, Plaintiff and Officer DiBella were assigned to a murder case involving a 22-year-old homosexual victim. After two years, Plaintiff and Sgt. Guzda accumulated enough evidence to obtain a warrant for the perpetrator. At the time of trial, Plaintiff and Officer DiBella drove to South Carolina to extradite a cooperating witness and earned overtime for the trip. *Id.* ¶¶ 59-60.

In December 2006, Plaintiff and Officer Laccona were assigned to a home invasion case in Greenwich, Connecticut. *Id.* ¶ 62.

In January 2007, Plaintiff, Officer DiBella, and Officer Laccona responded to a report of a gunpoint robbery at a bodega. Officers DiBella and Laccona left the scene after initial efforts to track the suspect were unsuccessful. Plaintiff continued to interview witnesses and obtained a lead on a potential suspect. *Id.* ¶ 63.

In July 2007, Plaintiff set up a "sting" operation to apprehend a suspect wanted for larceny and credit card theft. The suspect and victims were Hispanic. Plaintiff worked with other patrol officers. Officers DiBella and Laccona did not work on the case until an arrest was made. *Id.* ¶ 64.

In July 2007, Plaintiff worked on a gang rape case with Sgt. Guzda and Officer Laccona. Officer DiBella was not working at the time.  Plaintiff states in her affidavit that it was the "type of case that generated a lot of attention, work, and overtime."  When Officer DiBella returned to work, he was assigned to the case and Plaintiff was taken off the case.  *Id.* ¶ 65.

In June and July 2008, Captain Conklin assigned Plaintiff to work undercover with federal law enforcement officials.  *Id.* ¶ 66.

In 2008, Plaintiff investigated and obtained arrest warrants for two Hispanic individuals practicing unlicensed dentistry on Hispanic victims.  Officers DiBella and Laccona did not work on the case.  *Id.* ¶ 67.

In October 2008, Plaintiff, Officer DiBella, and Officer Laccona worked on an infant homicide case.  *Id.* ¶¶ 68-69; Delgado Dep. at 32-33, ECF No. 57-6; Laccona Dep. at 31-32.

In January 2009, Plaintiff, Sgt. Guzda, and Officer Laccona initiated a homicide investigation that attracted media attention involving a fight at a well-known Stamford diner. Officer DiBella was not present when Plaintiff, Sgt. Guzda, and Officer Laccona initially responded and interviewed witnesses.  Later, Sgt. Guzda took Plaintiff off the case and assigned Officer DiBella to work with Officer Laccona on the case.  Delgado Aff. ¶ 70.

In June 2009, Plaintiff and Officer DiBella were assigned to a serial bank robbery case. The next month, Sgt. Guzda assigned Officer DiBella to a grave robbery case that "attracted media attention."  *Id.* ¶¶ 79-80.  Around the same time, Sgt. Guzda assigned Officers DiBella and Laccona to a shooting case that was the "type of case that typically" generated overtime.  *Id.* ¶ 81.  Meanwhile, Plaintiff continued to work on the serial bank robbery case and earned significant overtime pursuing leads.  *Id.* ¶¶ 82-83.  The serial bank robbery case spanned many months and involved robberies in several towns and cities, and Plaintiff received recognition for

her efforts on the case.  Delgado Dep. at 18, 62, 84, ECF No. 57-6; Letter from Wilton Police Dept. at 1, ECF No. 65-17.

In August 2009, Sgt. Guzda assigned Plaintiff to a robbery case with a Hispanic victim. Delgado Aff. ¶ 90.

In November 2009, Plaintiff was assigned to a robbery-murder case with Officers DiBella and Laccona.  *Id.* ¶ 93-94.

In February 2010, Sgt. Guzda assigned Plaintiff and Officer DiBella to a home invasion and sexual assault case involving a Spanish-speaking victim.  *Id.* ¶ 95.

Plaintiff attests that Sgt. Guzda stopped assigning cases to her altogether in March 2010. *Id.* ¶ 108.

Plaintiff's notes indicate that on June 7, 2010, Sgt. Guzda assigned her and Officer Laccona to a "serious assault case."  Delgado Notes, ECF No. 57-10 at 8.

In June 2010, Sgt. Guzda assigned Plaintiff and Officer Laccona to work on an armed robbery case involving three suspects.  Delgado Aff. ¶ 115.

Defendant submitted an "Overtime Detail Report" showing that, from January 1, 2008 to July 10, 2010, Plaintiff worked approximately 699 overtime hours, Officer Laccona worked approximately 567 overtime hours, and Officer DiBella worked approximately 906 overtime hours.  ECF No. 57-12.

 **F.** **Assignment of Standby Duty**

Plaintiff also complains that Sgt. Guzda favored himself, Officer DiBella, and Officer Laccona when assigning standby duty.  Pl.'s Opp. at 12-13, 35, ECF No. 65; Delgado Aff. ¶ 77. Officers assigned to standby duty are on call during the midnight shift.  Delgado Aff. ¶ 72.  They receive $10 per hour and receive overtime pay if they are called to duty while on standby.  *Id.* ¶

73; Guzda Dep. at 150-51.

Plaintiff submitted a document labeled "Employee Attendance Statistics" showing that, from September 1, 2008 to August 31, 2010, Plaintiff worked 192 standby hours, Sgt. Guzda worked 888, Officer DiBella worked 760, and Officer Laccona worked 584.  Pl.'s Stmt., Ex. 14, ECF No. 65-15.[3]

### G.      Conflicts in Squad A

Beginning in October 2008, a number of incidents occurred which gave rise to interpersonal conflicts between Plaintiff and the other members of Squad A.  *See* Delgado Dep. at 22, ECF No. 65-28; Delgado Dep. at 72, 81-82, ECF No. 57-1; Delgado Dep. at 15, ECF No. 57-6; Laccona Dep. at 24-25, 102; DiBella Dep. at 18-19, 35; Guzda Dep. at 31.

On October 30, 2008, Sgt. Guzda was out of the office.  Plaintiff, Officer DiBella, and Officer Laccona were monitoring the patrol radio and heard a report about a potentially dead newborn baby.  Plaintiff went to the scene without telling Officers DiBella and Laccona, which Officers DiBella and Laccona thought was abnormal and inappropriate.  Plaintiff called from the

---

[3]      This document is unauthenticated; Plaintiff has not submitted an affidavit or declaration attesting to its provenance, authorship, or authenticity.  In fact, Plaintiff has not submitted an affidavit or declaration authenticating any of the exhibits to her opposition brief.  Judges in this district have required authentication at summary judgment. *See, e.g.*, *Barlow v. Connecticut*, 319 F. Supp. 2d 250, 257 (D. Conn. 2004) ("It is irrelevant that the documents can be properly authenticated if introduced at trial through a witness, if they have not been properly authenticated when submitted in support or opposition to summary judgment.") *aff'd sub nom. Barlow v. Dep't of Pub. Health, Conn.*, 148 F. App'x 31 (2d Cir. 2005).  Strict application of that rule here would mean disregarding many exhibits to Plaintiff's opposition.

However, Defendant has not challenged the authenticity of any of those exhibits.  The Second Circuit has noted that "a party is not required to authenticate documents on a summary judgment motion where, as here, authenticity is not challenged by the other party." *Daniel v. UnumProvident Corp.*, 261 F. App'x 316, 319 (2d Cir. 2008).  Moreover, some courts recognize that "in determining whether genuine issues of fact exist for trial, the court has the discretion to consider unauthenticated or otherwise objectionable evidence where it is apparent that the party may be able to authenticate and establish the admissibility of those documents at trial." *Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, No. 02-CV-814C(F), 2007 WL 2743449, at *3 n.3 (W.D.N.Y. Sept. 18, 2007); *see also Kramsky v. Chetrit Grp., LLC*, Nos. 10 Civ. 2638 (HB) and 10 Civ. 9458 (HB), 2011 WL 2326920, at *2 (S.D.N.Y. June 13, 2011) ("Where the Defendants would have the opportunity to authenticate these exhibits at trial, the Court will not strike them at this stage.").  Plaintiff's 56(a)2 Statement suggests that the document setting forth standby hours is based upon "[p]ersonnel records provided by the defendant." Pl.'s Stmt. at 15, ¶ 40.  Plaintiff may testify at trial that this document and others were prepared by herself or others on the basis of the City's personnel records produced during discovery.  On these grounds, the Court will consider the exhibits.

scene and told Officers DiBella and Laccona that witnesses were coming to give statements. Officers DiBella and Laccona were not prepared to take those statements because they did not know what was happening at the scene.  Later in the day, Plaintiff and Officer DiBella interviewed the mother, who spoke Spanish.  The mother indicated, in Spanish, that she felt uncomfortable with Officer DiBella in the room.  Officer DiBella left the room and the mother confessed.  Laccona Dep. at 31-38; DiBella Dep. at 31-37; Delgado Aff. ¶¶ 68-69.

Officer DiBella testified that, in 2009, he was assigned to a case that required him to go to a suspect's home.  While in the squad room with Plaintiff and others, Officer DiBella asked aloud if anyone had any information regarding the suspect's vehicle.  Officer DiBella received no response and left.  Later, another officer told Officer DiBella that, after he left, Plaintiff said she had the suspect's vehicle information but was not going to give it to Officer DiBella.[4] Officer DiBella testified that this bothered him because Plaintiff was holding back information in a "life or death" situation.  DiBella Dep. at 21-22.  Plaintiff attests that the only time she withheld information was on the serial bank robbery case.  Delgado Aff. ¶ 159.

On or about the evening of November 28, 2009, Officer Laccona was out of the office; he had gone to get dinner.  Plaintiff told a sergeant that it would be nice if she could leave early because it was her birthday.  The sergeant then told Officer Laccona that Plaintiff had complained that he was gone during his shift.  This incident upset Officer Laccona, and strained Plaintiff's relationship with Officer Laccona.  Delgado Dep. at 19-20, ECF No. 57-6; Delgado Dep. at 68-72, ECF No. 57-1; Laccona Dep. at 25.

On or about February 23, 2010, Plaintiff told Sgt. Guzda that she and another officer had

---

[4] Plaintiff objects that the other officer's statement is hearsay.  Pl.'s Stmt. ¶ 22.  The Court disagrees because the other officer's statement is not offered to prove that Plaintiff in fact withheld vehicle information from Officer DiBella.  *See* Fed. R. Evid. 801(c).  That fact is not in issue.  Rather, the fact of concern is that Officer DiBella was upset with Plaintiff because he believed that Plaintiff withheld vehicle information.

developed a suspect in a sexual assault investigation.  Earlier, Officer DiBella had shown

Plaintiff a photograph of that suspect and Plaintiff had said that she did not know the person.

This incident upset Officer DiBella and created tension between him and Plaintiff.  Sgt. Guzda

testified that Plaintiff's taking credit for developing the suspect caused hard feelings.  Delgado

Dep. at 72-73, ECF No. 57-1; Delgado Dep. at 14-15, ECF No. 57-6; DiBella Dep. at 56, 79-80;

Guzda Dep. at 85-86; Def.'s Stmt. ¶¶ 26-27; Pl.'s Stmt. ¶¶ 26-27.

Two days later, on February 25, 2010, Sgt. Guzda confronted Plaintiff because she had

sent a supplemental report regarding a sexual assault investigation to the youth bureau.  Sgt.

Guzda testified that he had clearly instructed Plaintiff not to send the report.  Guzda Dep. at 89-

90, 92.  Plaintiff testified that Sgt. Guzda never told her not to send the report.  Delgado Aff. ¶

101.  This incident made Sgt. Guzda "highly, highly upset."  Guzda Dep. at 89.  Sgt. Guzda told

Plaintiff that things had to change.  *Id.* at 91-92; Delgado Aff. ¶ 102.

Several days later, Sgt. Guzda called a meeting of Squad A.  Lieutenant Shaw had

recommended calling this meeting because of the ongoing conflicts in Squad A.  Guzda Dep. at

97-99.  During the meeting, Officer DiBella yelled at Plaintiff about taking credit for developing

the suspect in the sexual assault investigation.  Officer DiBella stood over Plaintiff, pointed his

finger at her, and said, "Go ahead.  It's always about you."  Delgado Dep. at 81-82, ECF No. 57-

1.  Plaintiff stood up and left the meeting.  *Id.* at 82; Guzda Dep. at 100.

On or about June 8, 2010, Plaintiff and Officer Laccona had two disagreements.  First,

Officer Laccona became upset when Plaintiff apprehended a suspect without a warrant when

Officer Laccona wanted to use a warrant.  Delgado Dep. at 30, ECF No. 57-6.  Second, Officer

Laccona became upset when Plaintiff changed a photo array that he had prepared for a lineup

after the arrest of a suspect.  Def.'s Stmt. ¶ 33; Pl.'s Stmt. ¶ 33.  Officer Laccona complained to

Sgt. Guzda about the photo array incident.  *Id.*

Officer Laccona testified that Plaintiff was moody at times, did not like to conduct

investigations the way that they were taught, and worked on her own and made investigations

difficult.  Laccona Dep. at 26.  Officer DiBella testified that he believed that Plaintiff preferred

to work on her own, hid things from the other officers in Squad A, was not credible, and could

not be trusted.  DiBella Dep. at 111-12.  Sgt. Guzda testified that the relationships in Squad A

were not working, and that Plaintiff's keeping things to herself and trying to making a name for

herself by taking credit was destroying camaraderie and the squad's "flow."  Guzda Dep. at 67-

68, 88, 91.  Plaintiff testified that her working relationships with Officers DiBella and Laccona

became strained as a result of these incidents.  Delgado Dep. at 72, ECF No. 57-6.  She testified

that her work relationship with Sgt. Guzda worsened after she complained in July 2009 that he

was assigning cases unfairly.  *See* Delgado Dep. at 34, ECF No. 57-1.

In the last weeks of Plaintiff's tenure in Squad A, Plaintiff and the other members of

Squad A were not speaking.  Guzda Dep. at 130-31; Delgado Aff. ¶ 127; Delgado Dep. at 98,

ECF No. 57-1; Laccona Dep. at 102; DiBella Dep. at 110.

### H.      Plaintiff's Complaints

In July 2009, Plaintiff complained to Sgt. Guzda that she felt that she was not being

treated fairly in the assignment of cases and overtime opportunities.  Delgado Dep. at 34, 54-56,

ECF No. 57-1.  Plaintiff testified that she was not making a formal complaint and "it was

actually just a conversation."  *Id.* at 85.  In that conversation, Sgt. Guzda stated that he assigned

Officers DiBella and Laccona to cases together because they work well together, *id.* at 55, and

because "guys talk about things that [Plaintiff] would not want to hear," *id.* at 85; Guzda Dep. at

72.  Plaintiff responded that she did not care about what Sgt. Guzda, Officer DiBella, and Officer

Laccona did outside the office, but all should be treated fairly and equally in the office.  Delgado

Dep. at 55, ECF No. 57-1.

After complaining to Sgt. Guzda in July 2009, Plaintiff told Sgt. Guzda's then-supervisor,

Lt. Shaw, that she thought Sgt. Guzda was not distributing work fairly.  *Id.* at 59.  Plaintiff

testified that this was "just a quick conversation, and that was about it.  It wasn't a go and file a

complaint type of situation."  *Id.*  She testified that she "wasn't raising concerns, it was just more

of a talking about things quickly.  It wasn't no sit down about having a conversation and talking

about things in particular."  *Id.* at 60.  Plaintiff did not complain about any inappropriate

comments she had heard, and she expected no response from Lt. Shaw.  *Id.*

On June 9, 2010, Plaintiff complained to Sgt. Guzda that she was being treated unfairly

because she was female.[5]  Delgado Aff. ¶ 122.  Sgt. Guzda testified that when Plaintiff

approached him about the distribution of cases, "a lot of the conversation [was] about me being

friends with Mike [DiBella] and Frank [Laccona]" and that "a lot of the cases she was talking

about she wasn't there, they were on weekends when she took off."  Guzda Dep. at 120.  Plaintiff

testified that Sgt. Guzda told her that he gravitates towards Officers DiBella and Laccona.

Delgado Dep. at 121, ECF No. 57-6.  Sgt. Guzda also told Plaintiff that he did not care who did

the work; he only cared about the final product.  *Id.* at 122; Delgado Aff. ¶ 122.

On June 14, 2010, Plaintiff complained to Lt. Matheny that Sgt. Guzda was unfairly

distributing cases.  Plaintiff did not tell Lt. Matheny that she thought that her sex or national

origin played a role in the distribution of cases.  Def.'s Stmt. ¶ 42; Pl.'s Stmt. ¶ 42.  Nor did

---

[5] At his deposition, Sgt. Guzda was asked about this meeting, "Do you recall [Plaintiff] saying that she thought [her unfair treatment in the distribution of cases] was because she was female?"  Sgt. Guzda answered, "No."  Guzda Dep. at 120.  Sgt. Guzda's testimony was not that Plaintiff did not raise her sex in this complaint, but that he did not recall her doing so.  *See id.*  The Court must resolve this contest in Plaintiff's favor at summary judgment.

Plaintiff complain to Lt. Matheny about inappropriate sexual comments or behavior, or inappropriate comments about Hispanic persons. Delgado Dep. at 92, ECF No. 57-1. Lt. Matheny advised Plaintiff to speak with Sgt. Guzda about the assignment of cases. Matheny Dep. at 61; Delgado Aff. ¶ 126. He told Plaintiff that if the situation was not resolved, he would move somebody out of Squad A. Def.'s Stmt. ¶ 43; Pl.'s Stmt. ¶ 43; Delgado Dep. at 127, ECF No. 57-6.

Plaintiff then attempted to speak to Sgt. Guzda again. *See* Matheny Dep. at 62; Delgado Aff. ¶ 127. Plaintiff returned to Lt. Matheny and told him that she had tried talking to Sgt. Guzda but was "not getting anywhere. This is not working out." Matheny Dep. at 62. Lt. Matheny told Plaintiff that he would speak to Sgt. Guzda and, if the issues were not resolved, she would be transferred because he would not move the other three members of Squad A. *Id.*

## I.     Plaintiff's Transfer

On June 23, 2010, Sgt. Guzda told Plaintiff that she was being transferred out of Squad A because she was not getting along with others. *See* Delgado Aff. ¶ 128; Guzda Dep. at 132; Def.'s Stmt. ¶ 46; Pl.'s Stmt. ¶ 46. Sgt. Guzda told Plaintiff that she was not being transferred because of the quality of her work and that her work was "great." Delgado Aff. ¶ 128; Guzda Dep. at 132. Plaintiff asked Sgt. Guzda if she was being transferred in retaliation for her speaking to Lt. Matheny. *Id.* ¶ 129. Sgt. Guzda allegedly responded, "You should never have gone to Matheny." *Id.* Sgt. Guzda was aware that Plaintiff had previously complained to Lt. Matheny. Guzda Dep. at 129. Lt. Matheny told Plaintiff later that day that her transfer had nothing to do with the quality of her work, which was "great." Delgado Aff. ¶ 130.

Sgt. Guzda could not transfer Plaintiff without Lt. Matheny's approval, Matheny Dep. at 68, and Lt. Matheny could not transfer Plaintiff without Captain Conklin's approval, *id.* at 99.

Thus, Sgt. Guzda asked Lt. Matheny to transfer Plaintiff out of Squad A. *Id.* at 69. Sgt. Guzda explained to Lt. Matheny that he had tried to get Plaintiff to share information, case notes, and files, but that Plaintiff was more interested in self-promotion than promoting the work of Squad A and that the situation in Squad A was "not working out." *Id.* at 63, 68-69, 98; *see* Guzda Dep. at 131. Then Lt. Matheny relayed the information he received from Plaintiff and Sgt. Guzda to Captain Conklin. Matheny Dep. at 99. Lt. Matheny asked several sergeants in the detective bureau if they would take Plaintiff on as an extra person in their respective units, but they all declined. *Id.* at 100; Def.'s Stmt. ¶ 50; Pl.'s Stmt. ¶ 50.

Plaintiff was transferred to patrol in the middle of a reassignment cycle. Delgado Aff. ¶ 131. Sgt. Guzda had told Lt. Matheny that he did not think Squad A would last until the end of the reassignment cycle. Matheny Dep. at 105-06.

After Plaintiff's transfer, Lt. Matheny asked two Spanish-speaking females to join Squad A. Pl.'s Stmt. ¶ 47; Def.'s Stmt. ¶ 47. Both declined. Pl.'s Stmt. ¶ 48; Def.'s Stmt. ¶ 48. A male officer replaced Plaintiff in Squad A, and he in turn was replaced by another male officer in September 2010. Delgado Aff. ¶¶ 139-40; ECF No. 65-23; ECF No. 65-22 at 6-7.

Transferring from the detective bureau to patrol is a lateral move; there is no change in pay or rank. Delgado Dep. at 71, ECF No. 57-6; Delgado Aff. ¶ 17. The same opportunities for overtime exist in patrol as in the detective bureau.[6] Def.'s Stmt. ¶ 55; Pl.'s Stmt. ¶ 55. Plaintiff

---

[6] Denying this assertion in her 56(a)2 Statement, Plaintiff cited to paragraph 153 of her affidavit. Pl.'s Stmt. ¶ 55. Paragraph 153 of her affidavit states that "[o]fficers in the detective bureau have a greater opportunity than uniformed police officers to earn official overtime." Delgado Aff. ¶ 153. But that statement is contradicted by Plaintiff's prior deposition testimony. Delgado Dep. at 108-09, ECF No. 57-1 ("Q: What I am asking you now is since you have left Squad A, I'm assuming that you have more opportunity for overtime on patrol? Am I right or wrong about that? A: No, you have the same opportunities in the Detective Bureau as you do in patrol."). "It is beyond cavil that 'a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony.'" *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 455 (2d Cir. 1999) (quoting *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)). The Second Circuit has noted that "[i]f . . . the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact sufficient to defeat

enjoys patrol.  Def.'s Stmt. ¶ 54; Pl.'s Stmt. ¶ 54; Delgado Dep. at 108, ECF No. 57-1.  She is a field-training officer now and enjoys that, too.  Delgado Dep. at 72, ECF No. 57-6.  She passed the most recent sergeant's examination and is a candidate for promotion.  Delgado Aff. ¶ 162.

## III.   STANDARD OF REVIEW

The Court shall grant summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has carried that initial burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  If no reasonable jury could find in favor of the opposing party because "the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

A fact is "material" if it might affect the outcome of the case under substantive law, and a dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014).

Summary judgment may be appropriate "even in the fact-intensive context of discrimination cases."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

---

summary judgment."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010).  The Court concludes that Plaintiff's affidavit contradicts her prior deposition testimony.  *Compare* Delgado Aff. ¶¶ 152-53 *with* Delgado Dep. at 108-09, ECF No. 57-1.

However, "summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Thus, "[a] trial court must be cautious about granting summary judgment to an employer when . . . its intent is at issue," and "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo*, 22 F.3d at 1224 (citations omitted). But "the mere incantation of intent and state of mind" does not "operate as a talisman to defeat an otherwise valid motion." *Meiri*, 759 F.2d at 998. Thus, "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

## IV.    DISCUSSION

### A.    Statutes of Limitations

As an initial matter, Defendant argues that many of the alleged incidents about which Plaintiff complains are time-barred and cannot be considered as a basis for relief under Title VII or CFEPA. *See* Def.'s Mem. at 27-28, ECF No. 55.

Under CFEPA, a discrimination charge must be filed within 180 days of the alleged discriminatory act. Conn. Gen. Stat. § 46a-82(f). This provision acts as a statute of limitations. *E.g.*, *Ericson v. City of Meriden*, 113 F. Supp. 2d 276, 286 (D. Conn. 2000) *aff'd*, 55 F. App'x 11 (2d Cir. 2002) ("[A]ny allegations of discriminatory conduct which occurred . . . 180 days prior to the plaintiff's . . . CCHRO filing . . . are time-barred and may not be considered as a basis for relief under CFEPA."). Plaintiff filed a charge of discrimination on December 3, 2010 with the

Connecticut Commission on Human Rights and Opportunities ("CCHRO").  Def.'s Stmt. ¶ 57;

Pl.'s Stmt. ¶ 57.  Thus, with respect to Plaintiff's CFEPA claims, conduct that occurred before

June 6, 2010 is time-barred.

Under Title VII, if the claimant filed a discrimination charge with a State or local agency

like the CCHRO, he or she must file that charge with the United States Equal Employment

Opportunity Commission ("EEOC") within 300 days after the alleged unlawful employment

practice occurred.  42 U.S.C. § 2000e-5(e)(1).  This provision also operates as a statute of

limitations.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).  Plaintiff

dually filed with the EEOC and the CCHRO.  Thus, with respect to Plaintiff's Title VII claims,

conduct that occurred before February 6, 2010 is time-barred.

An exception exists for hostile work environment claims, as discussed *infra*.  Also, time-

barred conduct may be considered as background evidence in support of Plaintiff's timely

claims.  *Morgan*, 536 U.S. at 113 (employee may use time-barred prior acts as background

evidence in support of timely claims).

**B.     Disparate Treatment on the Basis of National Origin**

Plaintiff's counsel stated at oral argument that Plaintiff is no longer pursuing a disparate

treatment claim on the basis of national origin, but rather only a hostile work environment claim

based in part on national origin.  Accordingly, the First and Second Claims for Relief in the

Complaint are dismissed to the extent that they claim disparate treatment on the basis of national

origin.  *E.g.*, *Dukes Bridge LLC v. Sec. Life of Denver Ins. Co.*, No. 10-CV-5491 (ILG) (RML),

2015 WL 3755945, at *6 (E.D.N.Y. June 16, 2015) (dismissing count that counterclaim plaintiff

agreed to stop pursuing at oral argument); *Myers v. New York Dep't of Motor Vehicles*, No. 06-

CV-4583 (NG) (VMS), 2013 WL 3990770, at *10 (E.D.N.Y. Aug. 5, 2013) (dismissing claims that plaintiff conceded at oral argument she was no longer pursuing).

### C.       Disparate Treatment on the Basis of Sex under Title VII and CFEPA

Plaintiff claims disparate treatment on the basis of her sex in violation of Title VII and CFEPA.  The same legal standard applies to both claims: the three-step burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *White v. Connecticut Dep't of Children & Families*, 330 F. App'x 7, 9 (2d Cir. 2009) (Title VII and CFEPA discrimination claims are subject to same burden-shifting analysis) (citing *Levy v. Comm'n on Human Rights & Opportunities*, 671 A.2d 349, 356-58 (Conn. 1996)).

To overcome a motion for summary judgment under the *McDonnell Douglas* framework, "a plaintiff must first satisfy an initial burden of proving by the preponderance of the evidence a prima facie case of discrimination."  *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 45 (2d Cir. 2015) (internal quotation marks omitted).  Establishment of the prima facie case creates a presumption that the employer unlawfully discriminated against the employee, thus placing upon the defendant "the burden of producing an explanation to rebut the prima facie case—*i.e.*, the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993) (internal quotation marks omitted).

"If the defendant makes such a showing, the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual."  *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006).  "[A]lthough the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and

inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143.

Finally, it is important to note that, although the evidentiary burden shifts back and forth, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Hicks*, 509 U.S. at 518.

### 1.     Prima Facie Case

To satisfy the prima facie burden in a discrimination case, a plaintiff must show: (1) she was a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003). "[T]he showing the plaintiff must make as to the elements of the prima facie case in order to defeat a motion for summary judgment is '*de minimus*.'" *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-04 (2d Cir. 1995).

### a.     Protected Class

Plaintiff is female, and therefore a member of a protected class.

### b.     Qualified for the Position

Plaintiff has satisfied her *de minimus* burden of showing that she was qualified for her former position in Squad A. The record evidence shows that Plaintiff investigated and solved cases during her tenure at Squad A, *see* Delgado Aff. ¶¶ 57, 82-83, 93-94, received positive feedback and recognition for her work, *id.* ¶¶ 66, 92; ECF No. 65-17, and was told by Sgt. Guzda and Lt. Matheny even at the time of her transfer that the quality of her work was "great," Delgado Aff. ¶¶ 128, 130. *See Terry*, 336 F.3d at 138 (plaintiff met prima facie burden of showing he was qualified for the position where it was undisputed that he had seventeen years of

experience, twenty-seven citations for superior accomplishments and outstanding performance, and a history of positive performance evaluations).

**c.      Adverse Employment Action**

A plaintiff suffers an adverse employment action when she experiences "a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quoting *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir. 1999)).  Though economic loss is not prerequisite to a finding of material adversity, "there must be a link between the discrimination and some 'tangible job benefits' such as 'compensation, terms, conditions or privileges of employment.'" *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quoting *Karibian v. Columbia Univ.*, 14 F.3d 773, 778 (2d Cir. 1994)). "An adverse employment action is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Littlejohn v. City of New York*, 795 F.3d 297, 312 n.10 (2d Cir. 2015) (internal quotation marks and citation omitted).  An adverse employment action may result from "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Galabya*, 202 F.3d at 640 (quoting *Crady v. Liberty Nat. Bank & Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)).

Plaintiff claims two adverse employment actions: (1) her transfer from Squad A to patrol; and (2) Sgt. Guzda's allegedly favoring Officers DiBella and Laccona in the assignment of cases resulting in an alleged loss of overtime for Plaintiff.  Pl.'s Opp. at 32, ECF No. 65.  Plaintiff has not carried her burden to show that either constituted an adverse employment action.

22

### i.      Transfer

First, Plaintiff has not offered sufficient evidence to raise a genuine dispute as to whether her transfer from Squad A to patrol constituted an adverse employment action.

"[A] transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career. . . . The key . . . is that the plaintiff must show that the transfer created a 'materially significant disadvantage.'" *Galabya*, 202 F.3d at 641 (quoting *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994)); *accord Flynn v. New York State Div. of Parole*, 620 F. Supp. 2d 463, 485 (S.D.N.Y. 2009) ("For a plaintiff to establish that a lateral transfer—one that does not involve a change in salary or rank—constitutes an adverse employment action, 'the plaintiff must show that the transfer created a "materially significant disadvantage."'") (quoting *Galabya*, 202 F.3d at 641).

In demonstrating materially significant disadvantage, the plaintiff must "proffer objective indicia of material disadvantage; subjective, personal disappointment[ ] is not enough." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008).  The objective evidence must show a materially significant disadvantage, "whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability." *Id.* at 165.  "[I]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir. 2006) (quoting *Fairbrother v. Morrison*, 412 F.3d 39, 56 (2d Cir. 2005)).  "Although a 'transfer from an "elite" unit to a "less prestigious" unit could constitute an adverse employment action,' a plaintiff cannot rely on her own opinion of the difference in prestige levels to withstand a motion for summary

judgment." *Flynn*, 620 F. Supp. 2d at 485-86 (citing *Dillon v. Morano*, 497 F.3d 247, 254–55 (2d Cir. 2007)).

Plaintiff has failed to proffer sufficient objective indicia of material disadvantage, and has thus failed to carry her prima facie burden.  Her transfer was lateral and involved no change in pay or rank.  Delgado Dep. at 71, ECF No. 57-6; Delgado Aff. ¶ 17.  Thus, Plaintiff must show that her transfer was "a setback to [her] career" and "materially significant disadvantage." *Galabya*, 202 F.3d at 641.

Plaintiff attests that her work in Squad A was "the most challenging an[d] intellectually demanding work that [she] had ever done in [her] career" and "allowed [her] to attack difficult problems in creative ways" and "was gratifying."  Delgado Aff. ¶¶ 156-57.  Apart from her testimony that she is now a field training officer, Plaintiff has not offered any particularized evidence regarding her current job responsibilities in patrol, but does attest in her affidavit that patrol work typically involves observing neighborhoods and responding to calls.  *Id.* ¶ 5.

This evidence may suggest that Plaintiff enjoyed her work in Squad A and perhaps viewed negatively the change in her job responsibilities.  Indeed, she claims that she "viewed the mid-cycle transfer as a demotion."  Pl.'s Opp. at 34, ECF No. 65.  But "the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action."  *Kessler*, 461 F.3d at 207.  Evidence of Plaintiff's disappointment in the change of her job responsibilities does not amount to objective indicia that Plaintiff's career has suffered a setback or materially significant disadvantage.  *See Monroe v. City of Danbury*, No. 3:09-cv-02132 (DJS), 2014 WL 3943632, at *7 (D. Conn. Aug. 11, 2014) ("The Court does not doubt that Monroe has a personal preference for a position in

[the Special Investigations Division].  His subjective preference does not, however, constitute objective evidence of material disadvantage . . . .").

Plaintiff may demonstrate objectively that her career has suffered a setback by showing that her new position is less conducive to career growth and advancement.  *Beyer*, 524 F.3d at 165.  Plaintiff points to Captain Conklin's testimony that "some people might feel" that working in the detective bureau is an asset to their careers, and was "not sure" whether experience in the detective bureau helped officers find employment after they leave the police department, but "I guess you could construe it as that."  Conklin Dep. at 15-16.  No reasonable jury could infer from this evidence that officers in the detective bureau have more opportunity for career advancement than officers in patrol, much less that Plaintiff herself has less of a chance for promotion now than she did before.  To the contrary, the evidence shows that Plaintiff's transfer did not impede her ability to pass the most recent sergeant's exam, making herself a current candidate for promotion.  *See* Delgado Aff. ¶ 162.  Moreover, she has not been denied any promotions since her transfer to patrol.  Delgado Dep. at 71, ECF No. 57-6.  Plaintiff has not raised a genuine dispute as to adverse employment action on this basis.

Another way for Plaintiff to demonstrate objectively a materially significant disadvantage is to show that her new position is "materially less prestigious."  *Beyer*, 524 F.3d at 165. Plaintiff attests in her affidavit, and the evidence shows, that officers in the detective bureau conduct investigations into serious crimes.  Delgado Aff. ¶ 153.  Plaintiff's testimony on this point is corroborated somewhat by Sgt. Guzda's testimony that his unit handles "some pretty important cases," Guzda Dep. at 29, and Captain Conklin's testimony that the work in the detective bureau is "very demanding," Conklin Dep. at 14-17.  But Plaintiff has not submitted any evidence that doing such work is objectively more prestigious or desirable than working in

25

patrol.  She points to no testimony from any witness, and the Court can find none, explaining why a position in the detective bureau is more prestigious than a position in patrol.  Plaintiff states in her memorandum of law that her transfer "constituted a loss of prestige."  ECF No. 65 at 33.  But "mere conclusory allegations or denials in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995).

The Court contrasts this case with its recent decision in *Abrams v. Connecticut*, No. 3:09-cv-00541 (RNC), 2015 WL 4459540, at *7-10 (D. Conn. July 21, 2015), where a black detective was denied a position in a major crimes van responsible for investigating particularly serious crimes.  In support of his argument that the position in the van was materially more prestigious than his current position, the plaintiff offered testimony from the sergeant who supervised and hired officers into the van, to the effect that the van was an "elite" position drawing only the "best of the best troopers," that "everybody at the time [he] was there aspired to be on the van" and that "[d]etectives on the van were held out to other troopers and the public as 'elite' law enforcement officers."  *Id.* at *7.  That sergeant's testimony was corroborated by other evidence, including the testimony of the lieutenant who reviewed hiring selections for the van, to the effect that he selected only detectives who had demonstrated excellence, and that more than thirty detectives applied to the van but only six could serve at any given time.  *Id.* at 8.  Finding that the plaintiff had raised a genuine dispute, the Court noted that the plaintiff did not rely only on his own testimony, but also that of others who "did not offer conclusory statements to the effect that van duty was prestigious: they explained why they thought so and why detectives were drawn to the van."  *Id.*  Such objective evidence is absent here.

Plaintiff directs the Court to non-binding cases from other Circuits in which courts held that a transfer from a detective bureau to patrol could reasonably be found to constitute an adverse employment action.  But those cases only underscore the point that such a conclusion is appropriate where evidence in the record supplies objective indicia of material disadvantage.  For example, the Fifth Circuit held that a jury reasonably could have found that the denial of a transfer from a "Specialist" position to a detective position constituted an adverse employment action where the plaintiff adduced a "plethora of evidence" showing that the detective position was "objectively superior" because it was "more intellectually challenging, ha[d] better benefits, ha[d] better work hours, and [wa]s widely recognized as more prestigious."  *Lewallen v. City of Beaumont*, 394 F. App'x 38, 43 (5th Cir. 2010).

Finally, Plaintiff contends that her transfer constituted an adverse employment action because it caused her to lose overtime opportunities.  Pl.'s Opp. at 32, ECF No. 65.  As explained *supra*, however, Plaintiff testified at her deposition that officers in patrol have the same opportunities for overtime as officers in the detective bureau, Delgado Dep. at 108-09, ECF No. 57-1, and she may not contradict that statement with her affidavit submitted in opposition to Defendant's motion for summary judgment.  *Bickerstaff*, 196 F.3d at 455.

Moreover, Plaintiff's compensation records show that, while she earned less departmental compensation (which includes salary and overtime) in the years following her transfer, she earned more income from side jobs (*e.g.*, providing security, traffic control), *see* ECF No. 65-27, which Plaintiff identifies as the other source of additional compensation for police officers besides overtime, Delgado Aff. ¶ 152.  As a result of this additional compensation, she made more money overall in the two full years that she worked following her transfer than she did in 2010, and earned more in 2013 than she did in 2008.  *See* ECF No. 65-27; *cf. Little v. Nat'l*

*Broad. Co.*, 210 F. Supp. 2d 330, 379 (S.D.N.Y. 2002) (genuine issue existed as to whether reassignment constituted adverse employment action where plaintiff "incurred an actual loss in income because of lost overtime").  This record cannot support a reasonable inference that Plaintiff's transfer constituted an adverse employment action on this basis.

The Court does not conclude as a matter of law that reassignment from a detective bureau to patrol does not constitute an adverse employment action.  Rather, the Court concludes that Plaintiff in this case has failed to adduce sufficient objective indicia of materially significant disadvantage to raise a genuine dispute that she suffered an adverse employment action.  *See Monroe*, 2014 WL 3943632, at *5-7 (no genuine dispute as to adverse employment action where plaintiff failed to produce objective evidence of material disadvantage from the denial of his lateral transfer (same salary and job description) from major crimes investigation unit to special investigations unit, and instead offered only his conclusory statements that latter position was more prestigious, had better hours, and presented more overtime opportunities).

### ii.  Assignment of Cases

Second, Plaintiff has failed to raise a genuine dispute that Sgt. Guzda's alleged practice of favoring Officers DiBella and Laccona in the assignment of overtime-generating cases constituted an adverse employment action.  As an initial matter, most of the alleged incidents of favoritism are time-barred.  Each of these alleged incidents is considered a discrete act, and therefore any such incidents pre-dating June 6, 2010 are time-barred as to Plaintiff's CFEPA claim, and any such incidents pre-dating February 6, 2010 are time-barred as to Plaintiff's Title VII claim.  *See Morgan*, 536 U.S. at 111 (noting that the term "unlawful employment practice" applies to a discrete act even though it has a connection to other acts, and quoting *Bazemore v.*

28

*Friday*, 478 U.S. 385, 395 (1986) for the proposition that "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII").

The only alleged incidents post-dating February 6, 2010 are (1) Sgt. Guzda assigning Plaintiff and Officer DiBella to a home invasion and sexual assault case on February 21, 2010, Delgado Aff. ¶ 95; (2) Plaintiff's allegation that Sgt. Guzda stopped assigning her cases altogether in March 2010, Delgado Aff. ¶ 108; (3) Sgt. Guzda assigning Plaintiff and Officer Laccona to a "serious assault case" on June 7, 2010, Delgado Notes, ECF No. 57-10 at 8; and (4) Sgt. Guzda assigning Plaintiff and Officer Laccona to an armed robbery case in June 2010, Delgado Aff. ¶ 115.  Plaintiff has not offered any evidence showing that these particular incidents resulted in her losing overtime opportunities to her male colleagues.  In fact, the evidence suggests the opposite.

Overtime records indicate that Plaintiff worked 27 overtime hours in March 2010, while Officer DiBella worked 14 and Officer Laccona worked 9.  *See* ECF No. 65-24 at 3, 8, 11. Based on the evidence in the record, no reasonable jury could find that Sgt. Guzda assigned Officer DiBella or Officer Laccona to any overtime-generating cases instead of Plaintiff during the period following February 6, 2010, and therefore no reasonable jury could find an adverse employment action on this basis.  Nonetheless, these alleged incidents, as well as those that are time-barred, may serve as background evidence in support of Plaintiff's timely discrimination claims to the extent that they are relevant and probative.  *Morgan*, 536 U.S. at 113.

### d.    Inference of Discrimination

Plaintiff satisfied her prima facie burden of showing that her transfer occurred under circumstances giving rise to an inference of discrimination.  Plaintiff's burden at this stage is "minimal" and "*de minimus*."  *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381

(2d Cir. 2001).  Indeed, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage." *Id.*  Plaintiff was replaced by a male, who in turn was replaced by another male.  Delgado Aff. ¶¶ 139-40; ECF No. 65-23; ECF No. 65-22 at 6-7.

**2.      Legitimate, Nondiscriminatory Reason**

At the second step of the *McDonnell Douglas* inquiry, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Hicks*, 509 U.S. 507.  Defendant has met this burden.

Defendant maintains that Plaintiff was transferred because of interpersonal conflicts between Plaintiff and her colleagues in Squad A.  Abundant evidence supports this contention. The record reveals that a number of incidents and disagreements resulted in strained relationships between Plaintiff and her colleagues.  *See generally supra*, Part II.G.

Officer Laccona testified that Plaintiff did not like to conduct investigations the way that they were taught, and worked on her own and made investigations difficult.  Laccona Dep. at 26. Officer DiBella testified that he believed that Plaintiff preferred to work on her own, hid information and files from the other officers in Squad A, was not forthcoming about suspects, was not credible, and could not be trusted.  DiBella Dep. at 19-21, 111-12.  Sgt. Guzda testified that the relationships in Squad A were not working, and that Plaintiff's keeping things to herself and attempting to make a name for herself by taking credit for developments in investigations was destroying the camaraderie and "flow" within Squad A.  Guzda Dep. at 67-68, 88, 91. Captain Conklin testified that Plaintiff "often sequester[ed] herself" and had poor communication skills.  Conklin Dep. at 64-65.  Even Plaintiff testified that her working relationships with Officers DiBella and Laccona became strained as a result of these incidents.

30

Delgado Dep. at 72, ECF No. 57-6.  She also testified that her work relationship with Sgt. Guzda

worsened after she complained in July 2009 that he was assigning cases unfairly.  *See* Delgado

Dep. at 34, ECF No. 57-1.

According to Defendant, such a state of affairs is not conducive to a well-functioning

investigation unit.  Lt. Matheny testified that "[p]eople that lock files away, don't share their

notes, and that kind of thing, are not contributing to the overall effectiveness of the unit."

Matheny Dep. at 78.  He explained that, in a small investigation unit, "it's important if you're

going to do really effective work that there be a certain level of trust, a spirit of teamwork, and

camaraderie has to exist between people in the unit, and . . . there was not as much of that in

[Squad A] as there should have been."  *Id.* at 42-43.

The friction in Squad A culminated in a situation where Plaintiff and her colleagues were

not speaking during her last few weeks.  Guzda Dep. at 130-31; Delgado Aff. ¶ 127; Delgado

Dep. at 98, ECF No. 57-1; Laccona Dep. at 102; DiBella Dep. at 110.

Just before Lt. Matheny made the decision to transfer Plaintiff, both Plaintiff and Sgt.

Guzda told Lt. Matheny that the situation in Squad A was "not working out."  Matheny Dep. at

62, 69, 98.  Sgt. Guzda testified that the situation in Squad A at that point was "beyond repair"

because Plaintiff was not speaking with the other members of Squad A, and that, in order for the

squad to function, she had to be reassigned.  Guzda Dep. at 131-32.  Lt. Matheny corroborated

this testimony, stating that Sgt. Guzda told him that the situation in Squad A was "toxic," and

that the members of Squad A were not going to be able to work together anymore.  Matheny

Dep. at 98.  Captain Conklin also testified that the decision to transfer Plaintiff was accelerated

when Plaintiff was not talking to her colleagues, which he described as a "very bad situation."

Conklin Dep. at 65.

In further support of its contention that Plaintiff's transfer was nondiscriminatory, Defendant points out that having a Spanish-speaking female officer in a major crimes investigation unit is an asset.  Def.'s Stmt. ¶ 44; Pl.'s Stmt. ¶ 44; Matheny Dep. at 114.  Thus, after Plaintiff's transfer, Lt. Matheny offered Plaintiff's former job to two Spanish-speaking female officers.  Pl.'s Stmt. ¶ 47; Def.'s Stmt. ¶ 47.  Both declined, and Defendant ultimately hired a male.  Delgado Aff. ¶¶ 139-40; ECF No. 65-23; ECF No. 65-22 at 6-7.

### 3.    Pretext

Even if Plaintiff had established her prima facie case, her claim would fail nonetheless because she has not carried her burden at the third step of the *McDonnell Douglas* inquiry, which requires her to show "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Hicks*, 509 U.S. 502, 515 (1993).  Plaintiff has failed to raise a genuine dispute as to this question, and therefore summary judgment is appropriate on this basis as well.

Plaintiff has not submitted evidence from which a reasonable jury could conclude that Defendant's stated reason is false.  That is, she has not shown, and as far as the Court can tell she makes no attempt to show, that there were not interpersonal conflicts in Squad A, especially in the weeks leading up to her transfer.  This is not surprising, because Plaintiff testified that her relationships with each of her colleagues became strained at one point or another.  She states in her opposition brief that she "generally had no problems working with Frank Laccona," ECF No. 65 at 39, but in support of that proposition cites to an incident report showing that Plaintiff and Officer Laccona apprehended a suspect together, but containing no indication as to the interpersonal relationship between Plaintiff and Officer Laccona, *see* ECF No. 65-13.  Plaintiff testified at her deposition that her relationship with Officer Laccona became strained, and Officer

Laccona corroborated this.  Delgado Dep. at 19-20, ECF No. 57-6; Delgado Dep. at 68-72, ECF No. 57-1; Laccona Dep. at 25.

Rather than showing that her relationships with her colleagues were not contentious, Plaintiff attempts to show that her investigation methods were proper and therefore, the argument goes, her colleagues' gripes were not legitimate.  *See* Pl.'s Opp. at 38-42, ECF No. 65.  For example, she argues that her response to the report of a potentially dead newborn baby was "proactive[ ]" and "aggressive[ ]" and that Officer DiBella's resentment about the way she handled the initial response is "obviously sour grapes."  *Id.* at 39.  As another example, she argues that when she kept information from her colleagues in the serial bank robbery case, she did so in order to prevent her department from arresting a suspect before other departments were prepared, but that "did not seem to matter" to Sgt. Guzda.  *Id.* at 40.  As a third example, she argues that she did "good police work" to identify a suspect using a fingerprint, but that this turned into a "turf war about credit and overtime."  *Id.*

These arguments miss the point.  The Court need not engage in the exercise of determining whether Plaintiff acted appropriately in her investigations.  *See Ricks v. Conde Nast Publ'ns*, 92 F. Supp. 2d 338, (S.D.N.Y. 2000) ("The mere fact that an employee disagrees with the employer's assessments of her work . . . cannot standing on its own show that her employer's asserted reason for termination was pretextual"); *Taylor v. Polygram Records*, No. 94 Civ. 7689 (CSH), 1999 WL 124456, at *10 (S.D.N.Y. Mar. 8, 1999) (plaintiff's attempt to rebut employer's explanation "by parsing the details of selected incidents, generally disputing her supervisors' assessments, and providing her own contrary appraisal of her work, is unavailing"). The question is whether Defendant's proffered reason for transferring Plaintiff was pretext.

Defendant's proffered reason for transferring Plaintiff was the interpersonal conflicts between Plaintiff and her colleagues.  When Lt. Matheny made the decision to transfer Plaintiff, he relied on information from Sgt. Guzda and Plaintiff herself that the situation in Squad A was "not working out," to the point that Plaintiff and the other members of Squad A were not even speaking to one another.  Plaintiff's efforts to show that her investigation methods were proper do not demonstrate that Defendant's proffered reason was false, *i.e.*, that the interpersonal conflicts did not exist and that Plaintiff and her colleagues were working well together.

In any event, Plaintiff offers no evidence that her colleagues' resentment toward her was because of her sex.  She asserts in her brief that Officers DiBella and Laccona resented her for "seizing the initiative and taking the lead" on a case and for "how much overtime she was making" on the serial bank robbery case, ECF No. 65 at 39, 41, but fails to show that those grounds for resentment were pretext for discriminatory animus.  The mere fact that Plaintiff is female does not give rise to an inference that her colleagues' resentment was because she is female.  Furthermore, the conclusory assertions in Plaintiff's brief that her colleagues' resentment "never would have been directed at a male detective" and that "it is hard to imagine such a complaint would be taken seriously about an aggressive male detective" do not give rise to a reasonable inference of discriminatory animus based on record evidence.

Plaintiff has failed to show that Defendant's nondiscriminatory reason was false.

Of course, this is not the only method for showing discrimination at the third stage of the *McDonnell Douglas* inquiry.  *Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").  Plaintiff may meet her burden at this stage by demonstrating that a discriminatory reason more likely than not motivated

34

Defendant's decision to transfer Plaintiff.  *Meiri*, 759 F.2d at 997 ("An employee may satisfy [her] ultimate burden 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'") (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)); *Fields*, 115 F.3d at 121 ("But though a plaintiff may not prevail only by showing that a proffered explanation is a pretext, it is not required to make such a showing."); *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 155-57 (2d Cir. 2010) (plaintiff not required to prove that employer's stated justification was false, but must establish that defendant was motivated at least in part by discrimination).  However, because Defendant's "stated reasons for the challenged action are strongly supported by the evidence, the burden on plaintiff to prove that they are a pretext for discrimination is substantial."  *Lucibello v. Yale-New Haven Hosp.*, No. 03-cv-814 2005 WL 578324, at *7 (D. Conn. Mar. 10, 2005).

To defeat summary judgment using this approach, Plaintiff must raise a genuine dispute that her sex was a motivating factor in the decision to transfer her.  Ordinarily, the focus would be on the intent of the decisionmaker, Lt. Matheny.  But Plaintiff has offered no evidence that Lt. Matheny himself was motivated by sex discrimination.  Instead, Plaintiff relies on a "cat's paw" theory, arguing that Sgt. Guzda's alleged discriminatory intent influenced Lt. Matheny.

"In a cat's paw scenario, a nondecisionmaker with a discriminatory motive dupes an innocent decisionmaker into taking action against the plaintiff."  *Saviano v. Town of Westport*, No. 3:04-cv-522 (RNC), 2011 WL 4561184, at *7 (D. Conn. Sept. 30, 2011).  In *Staub v. Proctor Hosp.*, 562 U.S. 411, 413 (2011), the Supreme Court considered "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate

employment decision."  The Court held that a plaintiff may establish "cat's paw" liability under the Uniformed Services and Reemployment Rights Act "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action. . . ." *Id.* at 417, 422.  The Court explained that "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'"  *Id.* at 419 (quoting *Hemi Group LLC v. City of New York*, 559 U.S. 1, 9 (2010)).

The Second Circuit has not expressly applied *Staub*'s "cat's paw" theory in the Title VII context, but has recognized theories of subordinate bias in employment discrimination cases. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435 (2d Cir. 1999) ("We recognize that the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision in violation of Title VII.  This is true even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the promotion process.") (citation omitted).  Observing this, and the fact that the Supreme Court noted that the statute at issue in *Staub* was "very similar to Title VII," *Staub*, 562 U.S. at 417, this Court has applied the "cat's paw" theory in Title VII and CFEPA employment discrimination cases.  *E.g.*, *Herbert v. Nat'l Amusements, Inc.*, No. 3:08-cv-1945 (VLB), 2012 WL 201758, at *1-2 (D. Conn. Jan. 23, 2012); *Rajaravivarma v. Bd. of Trustees for Conn. State Univ. Sys.*, 862 F. Supp. 2d 127, 149-50 (D. Conn. 2012).  The Court will do so again here.

### a.      Motivated by Discriminatory Animus

Plaintiff has failed to raise a genuine dispute that Sgt. Guzda was motivated by sex discrimination when he asked Lt. Matheny to transfer Plaintiff.  The record evidence shows that Sgt. Guzda went to Lt. Matheny and told him that the situation in Squad A was "toxic," that Plaintiff was not talking to her colleagues, and that it was "not working out."  Matheny Dep. at 63, 98; Guzda Dep. at 130-31.

To show that Sgt. Guzda's request was motivated by sex discrimination, Plaintiff relies on a number of circumstances from which she claims a reasonable jury could infer animus.

Plaintiff points to Sgt. Guzda's statement in August 2009 that he assigned Officers DiBella and Laccona to cases together because "guys talk about things that [Plaintiff] would not want to hear."  Guzda Dep. at 72; Delgado Dep. at 85, ECF No. 57-1.  This is a stray remark removed approximately 10 months from the decision to transfer Plaintiff, and was not made in relation to that decision.  *Henry*, 616 F.3d at 149-50 (in determining whether remark is probative, court looks to when remark was made in relation to employment decision and whether remark was related to decision-making process).  Plaintiff has not demonstrated any nexus between this remark and Sgt. Guzda's request for her transfer that would give rise to a reasonable inference that Sgt. Guzda was motivated by sex discrimination at the time of the request.  *See Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("[S]tray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination."); *Henry*, 616 F.3d at 149 ("[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"); *Rajaravivarma*, 862 F. Supp. 2d at 153 ("[T]he Supreme Court's decision in *Staub* suggests that the 'stray remark' inquiry should be altered in one minor respect to focus on

the nexus between the allegedly discriminatory remarks and the act that the supervisor as opposed to the ultimate decision maker performed which allegedly proximately caused the ultimate employment action.").

Plaintiff argues that Sgt. Guzda's alleged unfair assignment of overtime-generating cases supports an inference of discrimination.  But no reasonable jury could conclude from the record evidence that Sgt. Guzda unfairly assigned overtime-generating cases because of Plaintiff's sex.  At Part II.E *supra*, the Court catalogs the alleged incidents of unfair case assignments.  On its face, this list shows that (i) Plaintiff was assigned, often with another member of Squad A, to a number of cases, including a serial bank robbery investigation that generated substantial overtime for her, (ii) Plaintiff was "taken off"[7]  a gang rape case in July 2007 and a high-profile homicide case in January 2009 and Officer DiBella was then assigned to those cases, and (iii) while Plaintiff was working on the serial bank robbery case, Sgt. Guzda assigned Officers DiBella and Laccona to a case involving multiple shooters.  Notably, Plaintiff does not provide evidence showing that the cases she was "taken off" or the multiple shooter case actually generated overtime for her male colleagues.  Rather, she alleges that these were the "type of case that typically would generate" overtime."  Delgado Aff. ¶¶ 65, 81.

Similarly, she testified that, when she felt that she was being treated unfairly in the assignment of overtime opportunities, she did not look at a document reflecting the number of overtime hours that Officers DiBella and Laccona worked, but rather it was her perception from "being in the office and seeing the cases assigned" that Officers DiBella and Laccona were getting more overtime opportunities than her.  *See* Delgado Dep. at 54-55, ECF No. 57-1.  The overtime records show, however, that from January 1, 2008 to July 10, 2010, Plaintiff worked

---

[7] Sgt. Guzda testified that asking Plaintiff to handle another case did not mean that she "taken off" any other case that she had been working on.  Guzda Dep. at 65.

approximately 699 overtime hours, Officer Laccona worked approximately 567 overtime hours, and Officer DiBella worked approximately 906 overtime hours. ECF No. 57-12. In other words, Plaintiff had more overtime than one of her male co-workers, but less than the other. No reasonable jury could conclude from this evidence that Sgt. Guzda discriminatorily assigned overtime-generating cases, much less that he was motivated by discrimination when he requested Plaintiff's transfer.

Plaintiff points out that Officers DiBella and Laccona received more standby duty than she did. Specifically, from September 1, 2008 to August 31, 2010, Plaintiff worked 192 standby hours, while Officer DiBella worked 760 and Officer Laccona worked 584. Pl.'s Stmt., Ex. 14, ECF No. 65-15. Plaintiff has failed, however, to demonstrate that Sgt. Guzda's assigning Officers DiBella and Laccona more standby was sex-based discrimination and not preferential treatment on a nondiscriminatory basis. Moreover, Sgt. Guzda had concerns about Plaintiff's availability, *see* Guzda Dep. at 120, and Captain Conklin testified that Plaintiff refused to accept standby duty on the ground that she was "senior," Conklin Dep. at 59-60. Finally, Plaintiff has failed to establish any nexus between the disparity in standby hours and Sgt. Guzda's requesting Plaintiff's transfer, and has thus not raised a genuine dispute on this basis.

Plaintiff argues that transferring her mid-cycle suggests discrimination. But the evidence shows that male officers also have been transferred mid-cycle because of personality issues. *Compare* Delgado Aff. ¶ 131 *with* Matheny Dep. at 26; Guzda Dep. at 151-52; Conklin Dep. at 106-09. Sgt. Guzda himself was transferred mid-cycle. Guzda Dep. at 151-52. Lt. Matheny testified that Sgt. Guzda wanted Plaintiff transferred mid-cycle because he did not think that Squad A would make it to the end of the then-current cycle, Methany Dep. at 105-06, and Captain Conklin testified that Plaintiff's transfer was "accelerated" because she was not on

speaking terms with her colleagues in Squad A, Conklin Dep. at 65.  Plaintiff's mid-cycle

transfer was not anomalous, and does not give rise to a reasonable inference that Sgt. Guzda was

motivated by discrimination when he requested it.

Plaintiff notes that she was transferred, not Officer DiBella or Officer Laccona.  But this

fact does not give rise to a reasonable inference that Sgt. Guzda was motivated by discrimination

when he requested Plaintiff's transfer.  Lt. Matheny told Plaintiff after the June 14, 2010

complaint that if the situation in Squad A were not resolved, she would be transferred and not the

others.  Matheny Dep. at 62.  Transferring either Officer DiBella or Officer Laccona would not

have resolved the situation in Squad A because Plaintiff's relationships with all three of her

colleagues in Squad A were strained.  Plaintiff's evidence on this point might be sufficient to

carry a prima facie burden.  *See Abdu-Brisson*, 239 F.3d at 466-68.  But, given the overwhelming

evidence that Defendant transferred her for a legitimate reason, which reason Plaintiff has not

shown to be false, her evidence on this point does not defeat summary judgment.  *See id.* at 470;

*cf. Graham v. Long Island R.R.*, 230 F.3d 34, 44 (2d Cir. 2000) ("Only where overwhelming

evidence exists that an employer acted for reasons other than discrimination will the proof

submitted by the plaintiff as to similarly situated employees be negated.").

Finally, Plaintiff argues that "[a] jury may also infer from the descriptions used by

Guzda, Laccona, DiBella, Matheny and Conklin to justify transferring Officer Delgado

("moody" "difficult to get along with" "going off on her own" "doing her own thing") are [*sic*]

stereotypical code words are [*sic*] frequently used to describe a female working in an all-male

environment."  ECF No. 65 at 36.  Plaintiff apparently relies on testimony given in this litigation,

long after her transfer, to show that her transfer was discriminatory when made.  In both of the

cases that Plaintiff cites, the stereotyped remarks were made before or at the time of the adverse

employment action.  *See Sassaman v. Gamache*, 566 F.3d 307, 313-14 (2d Cir. 2009); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 115 (2d Cir. 2004).  Moreover, the stereotyped remarks in those cases had plain gender connotations, in contrast with the remarks Plaintiff identifies here.  *See id.*  Finally, for purposes of determining whether Sgt. Guzda was motivated by discrimination when he requested Plaintiff's transfer, the Court is concerned primarily with statements from Sgt. Guzda himself, and the Court's review of the record revealed no instances of Sgt. Guzda saying any of the phrases that Plaintiff identifies.

Plaintiff has not raised a genuine dispute as to whether Sgt. Guzda was motivated by discrimination when he requested Plaintiff's transfer.  Thus, even if Plaintiff had established her prima facie case, her claim would fail because she has not raised a genuine dispute "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Hicks*, 509 U.S. 502, 515 (1993).  This case falls within the scenario identified by the Supreme Court, where "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  *Reeves*, 530 U.S. at 148.

### D.    Retaliation under Title VII and CFEPA

Retaliation claims under Title VII and CFEPA are analyzed under Title VII principles and the *McDonnell Douglass* burden-shifting framework.  *See Littlejohn*, 795 F.3d at 315; *DeMoss v. Norwalk Bd. of Educ.*, 21 F. Supp. 3d 154, 170 (D. Conn. 2014).

To make out a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse

employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315-16. "Even if a plaintiff sets forth a prima facie case, however, this establishes only a rebuttable presumption of retaliation, and where the defendant identifies a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the defendant's articulated reason is a pretext for retaliation." *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110 (2d Cir. 2011); *see also Rivera v. Thurston Foods, Inc.*, 933 F. Supp. 2d 330, 341 (D. Conn. Mar. 19, 2013) (applying standard to Title VII and CFEPA claims). "Although the presumption of discrimination drops out of the picture if the Defendant articulates a legitimate, non-discriminatory reason, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Rivera*, 933 F. Supp. 2d at 341 (internal quotation marks and citation omitted).

With respect to Title VII retaliation claims, "[i]f the defendant satisfies its burden of production" to articulate a legitimate, non-retaliatory reason for the adverse employment action, then "the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretext for retaliation and that, more generally, the plaintiff's protected activity was a but-for cause of the alleged adverse action by the employer." *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 93-94 (2d Cir. 2014) (internal quotation marks and citations omitted); *accord Univ. of Tex. SW Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (claims of retaliation in violation of Title VII "must be proved according to traditional principles of but-for causation"). Connecticut courts have not yet adopted *Nassar*'s but-for causation standard for retaliation claims under CFEPA, and thus, CFEPA retaliation claims may remain subject to the less-demanding "motivating factor" analysis. *See Tremalio v. Demand Shoes, LLC*, No. 3:12-cv-

00357, 2013 WL 5445258, at *21 (D. Conn. Sept. 30, 2013).  The distinction does not matter in this case, however, because Plaintiff has not raised a genuine dispute under either standard.

        **1.**      **Prima Facie Case**

           **a.**     **Protected Activity**

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  A plaintiff is not required to show that the conduct she opposed was in fact unlawful; the plaintiff need only have had a "good faith, reasonable belief" that she was opposing a practice prohibited by Title VII.  *Kessler*, 461 F.3d at 210.  While protected activity generally involves filing a formal complaint, the Second Circuit has recognized that protected activity includes "informal protests of discriminatory employment practices, including making complaints to management." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990).  "However, such informal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII.  Generalized complaints about a supervisor's treatment are insufficient."  *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)).  Complaints presenting general allegations of harassment unrelated to protected class are not protected activity under Title VII or CFEPA.  *See, e.g.*, *Ruhling v. Tribune Co.*, No. 04-cv-2430, 2007 WL 28283, at *21 (E.D.N.Y. Jan. 3, 2007) (internal complaint of favoritism was not protected activity where plaintiff had not framed complaint as involving discriminatory conduct).

The Court concludes that only one of Plaintiff's complaints constituted protected activity: her June 9, 2010 complaint to Sgt. Guzda that she was being treated unfairly because she was female.  Sgt. Guzda could not recall whether Plaintiff said she thought her unfair treatment was

because she was female.  Guzda Dep. at 120.  But drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has raised a genuine dispute as to whether her June 9, 2010 complaint opposed unlawful sex discrimination.

Plaintiff has not raised a genuine dispute as to whether her June 14, 2010 complaint to Lt. Matheny constituted protected activity.  Plaintiff did not tell Lt. Matheny that she thought that her sex or national origin played a role in Sgt. Guzda's distribution of cases.  Def.'s Stmt. ¶ 42; Pl.'s Stmt. ¶ 42.  Nor did she complain to Lt. Matheny about inappropriate sexual comments or behavior, or inappropriate comments about Hispanic persons.  Delgado Dep. at 92, ECF No. 57-1.  Also, Lt. Matheny was not aware that Plaintiff previously had complained to Sgt. Guzda that he was assigning cases unfairly because of her sex.  *See* Matheny Dep. at 43.  No reasonable jury could conclude that Plaintiff had a good faith, reasonable belief that, in the context of this discussion with Lt. Matheny, she was opposing prohibited discrimination.

### b.     Defendant's Knowledge of the Protected Activity

Sgt. Guzda knew of Plaintiff's June 9, 2010 because it was directed to him.  The Court will assume *arguendo* that Defendant had knowledge of the protected activity.  *See Kessler*, 461 F.3d at 210 (general corporate knowledge that plaintiff engaged in protected activity satisfies knowledge requirement).

### c.     Adverse Employment Action

The Court concluded *supra* that Plaintiff has not raised a genuine dispute that her transfer constituted an adverse employment action for purposes of her disparate treatment claim.  A different standard applies when determining whether an adverse employment action occurred for purposes of a retaliation claim.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("plaintiff must show that a reasonable employee would have found the challenged action

materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.").  The Court declines to reach the question of whether Plaintiff's transfer constituted an adverse employment action for purposes of her retaliation claims, because her retaliation claims fail regardless because she has not raised a genuine dispute as to causation.

### d.  Causal Connection

To demonstrate a causal connection between her complaint and the decision to transfer her, Plaintiff relies on the temporal proximity between the two, which is approximately 14 days. Pl.'s Opp. at 53-54, ECF No. 65.  This is sufficient to meet Plaintiff's minimal prima facie burden.  *See El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII . . . ."); *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) (plaintiff satisfied prima facie burden on causal connection where recommendation for termination came two weeks after complaint); *Martel v. New Eng. Home Care, Inc.*, No. 3:09-cv-1412 (DJS), 2014 WL 3687738, at *15 (D. Conn. July 22, 2014) ("[Plaintiff] was terminated two weeks after she made her complaint of racial discrimination. For purposes of ruling on the defendant's motion for summary judgment, the Court will assume *arguendo* that the plaintiff has met her minimal burden of establishing a prima facie case of retaliation.").

### 2.  Legitimate, Nondiscriminatory Reason

As discussed *supra*, Defendant has amply satisfied its burden of production at the second step of the *McDonnell Douglas* inquiry.

3.      **Pretext**

To establish pretext in the retaliation context, a plaintiff may demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).  As discussed at length *supra*, Plaintiff has failed to show that Defendant's stated reason for transferring her was false.  She has not demonstrated "weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's explanation for her transfer. She attempted to show that her investigation methods were proper and did not warrant her colleagues' resentment, but has not shown that that resentment, upon which her transfer decision was based, did not exist.  *See Gehringer v. St. Joseph's/Candler Health Sys., Inc.*, No. 4:12-cv-77, 2013 WL 1180920, at *16 (S.D. Ga. Mar. 20, 2013) ("Whether [Plaintiff] was a good employee and whether Defendant made a bad decision is irrelevant as long as the termination was not made for discriminatory reasons.  [Plaintiff] fails to show any discriminatory reason.").

Plaintiff alleges that she asked Sgt. Guzda if she was being transferred in retaliation for her speaking to Lt. Matheny, and that Sgt. Guzda responded, "You should never have gone to Matheny."  Delgado Aff. ¶ 129.  It may be the case that Sgt. Guzda requested Plaintiff's transfer in retaliation for Plaintiff going over his head and complaining to Lt. Matheny on June 14, 2010. But, as noted above, that complaint did not constitute protected activity, and Title VII and CFEPA do not prohibit nondiscriminatory retaliation.  *See* 42 U.S.C. § 2000e-3(a); Conn. Gen. Stat. § 46-60(a)(4).

Plaintiff relies on temporal proximity to establish a causal connection between her complaint and the decision to transfer her.  Pl.'s Opp. at 53-54, ECF No. 65.  But at the third step

of the *McDonnell Douglas* inquiry, Plaintiff cannot rely on temporal proximity alone. "The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext. . . . Indeed, a plaintiff must come forward with some evidence of pretext in order to raise a triable issue of fact." *El Sayed*, 627 F.3d at 933; *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010) ("[W]hile the temporal proximity between [plaintiff]'s termination and her attorney's contacts with defendants satisfies the causation element of her *prima facie* case, it is insufficient to create a question of fact as to whether defendants' proffered non-retaliatory rationale for terminating [plaintiff], *i.e.*, her poor performance as documented in twenty-five detailed classroom evaluations, was pretextual").

Plaintiff has not come forward with sufficient evidence beyond temporal proximity to raise a genuine dispute as to pretext, regardless of whether the Court applies a but-for or motivating factor standard.

**E.    Hostile Work Environment under Title VII and CFEPA**

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The phrase "terms, conditions, or privileges of employment" strikes at the entire spectrum of disparate treatment in the workplace, including requiring people to work in a discriminatorily hostile environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Thus, Title VII is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment." *Id.* (internal quotation marks omitted). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Id.* The test also has a subjective component: the victim must subjectively perceive the environment to be hostile. *Id.*

In evaluating severity or pervasiveness, the Court must look at all of the circumstances, and may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002). "[I]ncidents must be more than episodic; they must be sufficiently continuous and concerted in order to be pervasive." *Id.* at 374. "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Id.* However, "even a single act can meet the threshold if, by itself, it can and does work a transformation of the plaintiff's workplace." *Id.*

The claimant also must show that a "specific basis exists for imputing the objectionable conduct to the employer." *Id.* at 373. Objectionable conduct is automatically imputed to the employer where the harasser is the victim's supervisor, subject to an affirmative defense discussed *infra*. *Gorzynski*, 596 F.3d at 103 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). As to the conduct of co-workers, "[t]he law is clear that an employer may not stand by and allow an employee to be subjected to a course of . . . harassment by co-workers." *Torres v. Pisano*, 116 F.3d 625, 636 (2d Cir. 1997) (internal quotation marks omitted). Thus, an employer is liable for

48

harassment perpetrated by the victim's non-supervisory co-workers if "the employer provided no reasonable avenue for complaint or . . . knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013).

Finally, the claimant must show that the hostile work environment existed because of his or her protected status (*i.e.*, race, color, religion, sex, or national origin).  *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (Title VII is directed only at discrimination based upon the categories protected by Title VII); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (plaintiff must demonstrate that "she was subjected to hostility because of her membership in a protected class").

The same standard governs hostile work environment claims under CFEPA.  *Martinez v. Conn., State Library*, 817 F. Supp. 2d 28, 55 (D. Conn. 2011); *Craine v. Trinity Coll.*, 791 A.2d 518, 531 n.6 (Conn. 2002) ("We look to federal law for guidance on interpreting state employment discrimination law, and the analysis is the same under both."); *Brittell v. Dep't of Corr.*, 717 A.2d 1254, 1264-66 (Conn. 1998).  Thus, the Court will analyze the claims under Title VII and CFEPA together.

### 1.    Continuing Violation Doctrine

As noted *supra*, conduct that occurred before June 6, 2010 is generally time-barred with respect to Plaintiff's CFEPA claims, and conduct that occurred before February 6, 2010 is generally time-barred with respect to Plaintiff's Title VII claims.

Under the continuing violation doctrine, however, "[i]t does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time

period of the hostile environment may be considered by a court for purposes of determining

liability." *Morgan*, 536 U.S. at 117.  The untimely acts must be "part of the whole" hostile work

environment.  *Id.* at 118.  If an act "for some . . . reason, such as certain intervening action by the

employer, was no longer part of the same hostile environment claim, then the employee cannot

recover for the previous acts."  *Id.*  "Although the continuing violation exception is usually

associated with a discriminatory policy, rather than with individual instances of discrimination,

and although acts so isolated in time . . . from each other . . . [or] from the timely allegations[ ] as

to break the asserted continuum of discrimination will not suffice, . . . a continuing violation may

be found where specific and related instances of discrimination are permitted by the employer to

continue unremedied for so long as to amount to a discriminatory policy or practice."  *Fitzgerald*

*v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (internal quotation marks and citations omitted).

The continuing violation doctrine applies to hostile work environment claims under Title VII and

CFEPA.  *Ravenscroft v. Williams Scotsman, Inc.*, No. 3:14-cv-870 (MPS), 2015 WL 1311332, at

*3 n.2 (D. Conn. Mar. 23, 2015).

Plaintiff is asserting one hostile work environment claim based on both (i) the alleged

derogatory remarks about Hispanics, and (ii) the alleged sexual comments and behavior.  *See*

Pl.'s Opp. at 45-46.  The Court may consider all of that conduct in determining whether the

continuing violation doctrine applies.  *See Domb v. Metro. Life Ins. Co.*, No. 01 Civ. 10074

(GEL), 2003 WL 21878784, at *6 (S.D.N.Y. Aug. 7, 2003) (in determining application of

continuing violation doctrine, the court declined to treat comments about plaintiff's religion, sex,

and national origin as three separate hostile work environment claims because plaintiff "had one

work environment that was either made hostile by . . . discriminatory remarks or not").

Plaintiff testified that Sgt. Guzda and Officer DiBella "constantly" made derogatory remarks about Hispanic persons "[t]hroughout [her] tenure" in Squad A, which ended in July 2010, Delgado Aff. ¶ 144; Delgado Dep. at 86-87, ECF No. 57-1, and "constantly" made inappropriate sexual comments, Delgado Aff. ¶ 40.  On this evidence alone, a reasonable jury could find that an act contributing to the alleged hostile work environment occurred after June 6, 2010.  *See Barrows v. Seneca Foods Corp.*, 512 F. App'x 115, 117 (2d Cir. 2013) ("[The plaintiff] does allege that [his supervisor] 'constantly' made vulgar sexual comments, which, drawing all reasonable inferences in favor of the plaintiff, means that an act contributing to [the plaintiff]'s hostile work environment claim occurred sometime within the limitations period. Without further factual development, we simply cannot conclude as a matter of law that [the plaintiff]'s Title VII claim is barred by the statute of limitations."); *Domb*, 2003 WL 21878784, at *6 (the fact that plaintiff did not give specific dates falling within limitations period did not defeat her claim where she claimed that offensive comments occurred on a weekly basis up until her termination).  Plaintiff has raised a genuine dispute as to the application of the continuing violation doctrine, and therefore, for purposes of this motion, the Court may consider conduct occurring outside the limitations periods.

### 2.    Severe or Pervasive

Plaintiff has raised a genuine dispute as to whether her workplace was permeated with discriminatory conduct severe or pervasive enough to create a hostile work environment.

As noted above, in evaluating severity or pervasiveness, the Court must look at all of the circumstances, and may consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at 23.

Importantly, "a plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive."  *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis in original).

Defendant argues that Plaintiff has alleged only stray remarks that cannot support her claim.  Def.'s Mem. at 30, ECF No. 55.  The Court disagrees.  Plaintiff testified that Sgt. Guzda and Officer DiBella "constantly" made derogatory remarks about Hispanic persons throughout her tenure in Squad A and "constantly" made inappropriate sexual comments.  Delgado Aff. ¶¶ 40, 144; Delgado Dep. at 86-87, ECF No. 57-1.  *See Torres*, 116 F.3d at 631 ("If a jury were to credit [plaintiff's] general allegations of constant abuse . . . it could reasonably find pervasive harassment, even in the absence of specific details about each incident").  The Second Circuit has recognized that a "steady barrage of opprobrious racial comments" may result in a hostile work environment depending on the quantity, frequency, and severity of the slurs considered cumulatively.  *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997).  A reasonable jury could conclude that Officer DiBella's alleged constant use of the term "spic," Sgt. Guzda's alleged constant use of the terms "guat" and "taco guy" to refer to Hispanic persons regardless of their national origin, and comments regarding Hispanics being drunk and having illegal kids, constituted a steady barrage of opprobrious comments demeaning to Hispanics.  Given that the pervasiveness determination is "the sort of issue that is often not susceptible of summary resolution," *DiLaurenzio v. Atlantic Paratrans, Inc.*, 926 F. Supp. 310, 314 (E.D.N.Y. 1996), this Court cannot conclude as a matter of law that these remarks, taken cumulatively with the alleged use of the words "pussy," "tits," and "cunt," obscene sexual jokes and stories, and references to penis size, were not sufficiently pervasive to create a hostile work environment.  *See Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 21 (2d Cir. 2014) ("We are obliged to

consider the defendants' alleged uses of slurs cumulatively in order to obtain a realistic view of the work environment") (internal quotation marks omitted); *Torres*, 116 F.3d at 633 ("A reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a 'dumb spic' and told her that she should stay home, go on welfare, and collect food stamps like the rest of the 'spics' to be hostile."); *Schwapp*, 118 F.3d at 108-12 (holding that district court erred in finding no triable issue on hostile work environment claim where African-American police officer experienced twelve incidents of racial conduct over twenty months, involving racist jokes and epithets that insulted blacks, Puerto Ricans, and people of Middle Eastern origin).

The fact that not all of the sexual comments or comments about Hispanic persons were directed at Plaintiff does not defeat her claim. *See Torres*, 116 F.3d at 633 (fact that many of supervisor's comments were not made in plaintiff's presence was "of no matter" because "an employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile"); *Schwapp*, 118 F.3d at 111 (district court erred in failing to consider incidents that did not occur in plaintiff's presence, noting that "[j]ust as a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment, . . . the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment") (internal citation omitted). Moreover, the fact that Plaintiff did not complain about the derogatory remarks about Hispanics, or complain about the sexual remarks and behavior after December 2008, may lead a factfinder to discredit Plaintiff's claim that she suffered a hostile work environment, but such matters of credibility are not to be determined at summary judgment. *See Rivera*, 743 F.3d at 22-23.

Further, a genuine dispute exists as to whether Sgt. Guzda repeatedly unzipped his pants and tucked in his shirt in front of Plaintiff despite her attempts to leave his presence. Plaintiff

testified that this occurred two to three times per week from some time in 2009 until April 2010. Sgt. Guzda testified that it never occurred. Crediting Plaintiff's version, which the Court must do at this stage, a reasonable juror could conclude that this alleged conduct, even if not severe, occurred with sufficient frequency to amount to pervasive sexual hostility.

Plaintiff also has raised a genuine dispute as to whether she subjectively perceived her work environment to be hostile. Plaintiff's testimony reveals that she was offended by the derogatory remarks about Hispanics, Delgado Dep. at 86-87, ECF No. 57-1, was disgusted and made uncomfortable by the crude sexual comments, Delgado Aff. ¶ 44, 109, and was made uncomfortable by Sgt. Guzda's allegedly unzipping his pants and tucking in his shirt in front of her, Delgado Dep. at 143, ECF No. 57-6. *See Schwapp*, 118 F.3d at 112 (whether plaintiff perceived hostile work environment was a "factual issue that should be resolved by a trier of fact"); *e.g.*, *Badlam v. Reynolds Metals Co.*, 46 F. Supp. 2d 187, 196 (N.D.N.Y. 1999) (plaintiffs raised genuine dispute as to perceiving hostile work environment where evidence showed that they were personally offended by crude sexual remarks); *Dyke v. McCleave*, 79 F. Supp. 2d 98, 105 (N.D.N.Y. 2000) (same).

### 3.    Because of Plaintiff's Sex and/or National Origin

Title VII is not a "general civility code for the American workplace." *Oncale*, 523 U.S. 75, 80. It does not prohibit all verbal or physical harassment in the workplace, but rather is directed only at discrimination because of the victim's membership in a protected class. *Id.* To survive summary judgment, therefore, Plaintiff must raise a genuine dispute as to whether she was subjected to hostility "because of her membership in a protected class." *Brennan*, 192 F.3d at 318. She has done so.

Several of the derogatory remarks about Hispanics plainly were directed at Plaintiff because she is Hispanic.  For example, Sgt. Guzda allegedly told Plaintiff that he assigned her to a case with a Hispanic victim, "Because they speaka da Spanish like you" in a mocking voice, and sometimes said "mira, mira" to get Plaintiff's attention.  *See Costantin v. New York City Fire Dep't*, No. 06 Civ. 04631 (GBD) (THK), 2009 WL 3053851, at *19 (S.D.N.Y. Sept. 22, 2009) ("Evidence that supervisors ridiculed an employee's accent may thus help support a finding that the employer created a hostile work environment because of the employee's national origin."); *Levitant v. City of New York Human Res. Admin.*, No. 05 Civ. 0230 (JFB) (MDG), 2008 WL 5273992, at *10 (E.D.N.Y. Dec. 18, 2008) (finding issues of fact on a hostile work environment claim based on national origin in part because defendants mocked plaintiff's Russian accent).  On another occasion, Sgt. Guzda allegedly asked Plaintiff, "Why do you only have two names and not four names like rest [*sic*] of the 'Guats'?"  Delgado Aff. ¶ 146.  Sgt. Guzda would not have posed this question but for Plaintiff's Hispanic national origin.

Likewise, some incidents of sexual conduct plainly were directed at Plaintiff because she is a woman.  In the context of officers making sexual comments and jokes, Sgt. Guzda told Plaintiff she would come to "know the entire male anatomy."  Also, a reasonable jury could infer that Sgt. Guzda repeatedly called Plaintiff, not her male colleagues, into his office while he unzipped his pants and tucked in his shirt because Plaintiff is a woman.

Remarks not directed specifically at Plaintiff may also be considered to have been made "because of" Plaintiff's national origin or sex, and must be considered together with conduct directed at her specifically.  Courts have recognized that the "because of" requirement is satisfied where the workplace is permeated with gender-specific, race-specific, or national-origin-specific slurs, epithets, and negative stereotypes, even if not directed at the plaintiff specifically, and even

if they are not directed at particular women or individuals of the plaintiff's national origin but instead several groups are exposed to them. *See, e.g.*, *Petrosino v. Bell Atl.*, 385 F.3d 210, 222 (2d Cir. 2004) ("The fact that much of this offensive material was not directed specifically at [the claimant] . . . does not, as a matter of law, preclude a jury from finding that the conduct subjected [the claimant] to a hostile work environment based on her sex."); *Schwapp*, 118 F.3d at 111 ("a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment"); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 85 (2d Cir. 2010) (finding that comments such as "bitch[y]," being "on the rag," or a general reference to a "titty bar" were gendered terms that could be understood to be "particularly demeaning to women as a group" and noting, "[t]hat this sexually derogatory language was not always directed specifically at [plaintiff] or even necessarily at individual women, and rather appears to be the product of a locker-room office culture that both men and women observed (and in which some women even participated) does not insulate [defendant] from a Title VII hostile work environment claim."); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811–12 (11th Cir. 2010) (characterizing the use of terms "whore," "bitch," and "cunt" as being "targeted at [a woman's] gender").

Thus, even though not directed specifically at Plaintiff because she belongs to the female sex, the sexual remarks about which she complains, such as use of the terms "pussy," "tits," and "cunt," and references to the size of particular women's breasts have "obvious gender connotations that a reasonable person in plaintiff's position reasonably could understand to be particularly demeaning to women as a group," *McGullam*, 609 F.3d at 85, and were therefore made "because of" Plaintiff's sex. *See Petrosino*, 385 F.3d at 221-22 (concluding that the "sexually offensive comments and graffiti" at issue were "more offensive to women than to men and, therefore, discriminatory based on sex" even though both men and women were exposed to

them).  Likewise, although not obviously directed specifically at Plaintiff because she is Puerto

Rican, the instances of the words "spic," "guat," and "taco guy," and the negative stereotyping

comments about Hispanics being drunk and having illegal kids are particularly demeaning to

Hispanics as a group and were thus made "because of" Plaintiff's national origin.  *See*

*McGullam*, 609 F.3d at 85.

        **4.**       **Employer Liability**

      A plaintiff seeking to hold an employer liable for a hostile work environment created by

its employees must show that a "specific basis exists for imputing the objectionable conduct to

the employer." *Alfano*, 294 F.3d at 373.  A supervisor's harassing conduct is imputed

automatically to the employer, but not if the employer proves an affirmative defense consisting

of two elements: "(1) the employer exercised reasonable care to prevent and correct promptly

any [discriminatory] harassing behavior, and (2) the plaintiff employee unreasonably failed to

take advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise." *Gorzynski*, 596 F.3d at 103 (quoting *Faragher*, 524 U.S. at 807 and

*Ellerth*, 524 U.S. at 765) (internal quotation marks omitted).

      This affirmative defense, commonly referred to as the *Faragher/Ellerth* defense, is not

available, however, "when the supervisor's harassment culminates in a tangible employment

action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. at 808.

"A tangible employment action constitutes a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.

      Sgt. Guzda was Plaintiff's supervisor.  His alleged harassment is imputed automatically

to Defendant unless Defendant makes out a *Faragher/Ellerth* defense.  Plaintiff claims that the

*Faragher*/*Ellerth* defense is not available to Defendant because the alleged hostile work environment culminated in a tangible employment action – her transfer. The Court disagrees.

To bar the *Faragher*/*Ellerth* affirmative defense, a tangible employment action must have been the culmination of harassment. Where the tangible employment action occurred for a reason other than harassment, the tangible employment action does not bar the defense. *See, e.g.*, *Bennett v. Progressive Corp.*, 225 F. Supp. 2d 190, 204 (N.D.N.Y. 2002) ("Whether a termination constitutes a tangible employment action depends on whether such termination was a culmination of the sexual harassment, or if the plaintiff was fired for another reason."); *Citroner v. Progressive Cas. Ins. Co.*, 208 F. Supp. 2d 328, 341 (E.D.N.Y. 2002) ("In this case, defendant is entitled to rely on *Faragher* and *Ellerth* because, even though plaintiff was terminated, this termination was not the culmination of any harassment against plaintiff."); *Patterson v. CBS, Inc.*, 2000 WL 666337, *8 (S.D.N.Y. 2000) (CBS could raise *Faragher*/*Ellerth* affirmative defense because, even though plaintiff was sexually harassed and terminated, evidence showed that plaintiff was terminated for leaving his camera during live broadcast).

As discussed *supra*, Defendant has shown that Plaintiff's transfer was the culmination of interpersonal conflicts, and Plaintiff has not rebutted that showing. Moreover, Plaintiff has demonstrated no nexus between her transfer and the conduct alleged to have contributed to her hostile work environment. Without deciding whether Plaintiff's transfer was a tangible employment action, the Court concludes that Plaintiff has not raised a genuine dispute that her transfer was the culmination of the alleged harassment that forms the basis of her hostile work environment claim. Therefore, the *Faragher*/*Ellerth* defense is available to Defendant.

### i.      Reasonable Care

The first prong of the *Faragher*/*Ellerth* defense requires a showing that Defendant "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Ellerth*, 524 U.S. at 807. "Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense." *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001) (quoting *Caridad v. Metro-N. Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999)).

Defendant had an anti-harassment policy with a procedure for filing complaints and initiating formal investigations. Plaintiff received that policy, and does not claim that it is ineffective. Indeed, the successful resolution of Plaintiff's 2008 complaint of sexual harassment indicates that Defendant endeavors to investigate and remedy problems reported by its employees. Under these circumstances, no reasonable jury could conclude that Defendant failed to exercise reasonable care to prevent and correct any harassing behavior. *See id.* at 245 (first prong of *Faragher/Ellerth* defense satisfied where defendant had anti-harassment policy and complaint procedure); *Caridad*, 191 F.3d at 295 (same).

### ii.     Failure To Take Advantage of Corrective Opportunities

The second prong of the *Faragher*/*Ellerth* defense requires a showing that Plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807. "Once an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint procedure, the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures. The

employer may rely upon the absence or inadequacy of such a justification in carrying its ultimate burden of persuasion." *Leopold*, 239 F.3d at 246.

It is undisputed that Plaintiff never complained about the alleged derogatory remarks about Hispanics and did not complain about the alleged sexual comments and behavior after they allegedly resumed in or about March 2010.  Thus, Defendant has carried its initial burden of production.  The burden now shifts to Plaintiff to explain why she did not complain.

Plaintiff maintains that she had a "credible fear" that she would be transferred out of Squad A if she complained about the alleged harassment.  Pl.'s Submission of Suppl. Auth. at 3, ECF No. 91.  An employee may satisfy her burden of production to "come forward with one or more reasons why the employee did not make use of the [complaint] procedures," *Leopold*, 239 F.3d at 246, by showing that she had "a credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint," *Caridad*, 191 F.3d at 295.  "A credible fear must be based on more than the employee's subjective belief.  Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Leopold*, 239 F.3d at 246.

In support of her contention that she had a "credible fear," Plaintiff cites to three portions of the record which she claims show that Sgt. Guzda warned her against complaining to a higher level and threatened to remove her from Squad A.  ECF No. 91 at 3.

First, she cites a portion of her affidavit concerning a case in which she helped develop a match between a suspect's fingerprint and a fingerprint recovered from a crime scene.  When Officer DiBella drafted the arrest warrant, he omitted the evidence about the fingerprint at the crime scene.  Plaintiff raised this with Sgt. Guzda.  Sgt. Guzda accused plaintiff of "seeking

glory," told her to think twice about bringing the complaint any further, and told her that it would be wise not to mention it to any higher authority.  Delgado Aff. ¶¶ 97-100.

Second, she cites to a portion of her affidavit concerning the meeting in which Officer DiBella yelled at Plaintiff for not giving him credit for developing a suspect and said, "It's always about you."  Delgado Aff. ¶ 106.  Plaintiff asked Sgt. Guzda if he was going to let Officer DiBella "continue to bully [her.]  Guzda stated that this was the way it was going to be."  *Id.*

Third, she cites a portion of her deposition testimony in which she stated that she never complained about sexual harassment after December 2008 "because at that point that's when Guzda's behavior towards me changed and at one point he told me if I don't like it, there's the door.  So, I felt if I complained, that I was going to get kicked out."  Delgado Dep. at 50, ECF No. 57-6.  Plaintiff testified that Sgt. Guzda made these comments "[w]hen [she] started talking about not being treated fairly in the office."  *Id.*  The Court understands Plaintiff's testimony to refer to the discussions she had with Sgt. Guzda regarding the distribution of cases.  *See id.*

Plaintiff has not carried her burden of production because no reasonable jury could conclude from the record evidence that she had a credible fear that she would suffer an adverse employment action if she complained about the alleged harassment that forms the basis of her hostile work environment claim.

First, Plaintiff has not produced "[e]vidence . . . to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints."  *Leopold*, 239 F.3d at 246.  Plaintiff complained of sexual harassment in 2008, the situation was resolved to her satisfaction, and she suffered no retaliation.  Delgado Dep. at 51-53, ECF No. 57-6; ECF No. 57-7.  There is no evidence that Defendant ignored or

resisted other employees' harassment complaints, or retaliated against other employees for making harassment complaints.

Second, Sgt. Guzda's comments may give rise to a reasonable inference that Plaintiff feared that Sgt. Guzda would retaliate if she complained to his superiors about Officer DiBella not including fingerprint evidence in an arrest warrant or about the distribution of cases. Indeed, that may have happened in this case. *See* Delgado Aff. ¶ 129 ("You should never have gone to Matheny."). They do not, however, give rise to a reasonable inference that Plaintiff feared that Sgt. Guzda would retaliate if she complained about the alleged harassment that forms the basis of her hostile work environment claim. Notably, Sgt. Guzda was Plaintiff's supervisor when she complained about sexual harassment in 2008, and he took no action against her for making that complaint. Def.'s Stmt. ¶¶ 2-3; Pl.'s Stmt. ¶¶ 2-3; Delgado Dep. at 52-53, ECF No. 57-6.

Third, Defendant's anti-harassment policy included confidentiality and anti-retaliation provisions. ECF No. 57-8 at 8 ("All inquiries, complaints, and investigations are treated confidentially consistent with Connecticut Laws. . . . . The Director of Human Resources will take adequate steps to ensure that the complainant is protected from retaliation during the period of the investigation and beyond, and that confidentiality will be maintained, to the extent possible, without hindering the investigation."). *See, e.g.*, *Weger v. City of Ladue*, 500 F.3d 710, 725 (8th Cir. 2007) ("[T]he reasonableness of Plaintiffs' fears of retaliation is further called into question because the Department's antiharassment policy contained an antiretaliation provision."); *Reed v. Belknap Heating & Cooling, Inc.*, No. 01-CV-0829E(SC), 2004 WL 912877, at *6 (W.D.N.Y. Apr. 20, 2004) ("Moreover, plaintiff's apprehension, which was based on what she perceived as a threat from [her supervisor], is not evidence of a credible fear

considering the fact that [her employer]'s anti-harassment policy included both a confidentiality and a anti-retaliatory provision.").

Plaintiff has not carried her burden of production to show that she had a credible fear, and Defendant has carried its ultimate burden to show that Plaintiff unreasonably failed to avail herself of corrective opportunities offered by Defendant.  Therefore, Defendant is not vicariously liable for Sgt. Guzda's alleged harassment.  *See Faragher*, 524 U.S. at 807.

As to the conduct of Plaintiff's non-supervisory co-workers, Defendant is vicariously liable only if it "provided no reasonable avenue for complaint or . . . knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action."  *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013); 29 C.F.R. § 1604.11 ("With respect to conduct between fellow employees, an employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.").

Plaintiff has raised a genuine dispute as to whether Defendant knew or should have known about the alleged harassment by her co-workers and failed to take remedial action. Plaintiff testified that Sgt. Guzda and Officer DiBella "constantly" made derogatory remarks about Hispanics, and that Sgt. Guzda, Officer DiBella, and others "constantly" made inappropriate sexual comments.  Delgado Aff. ¶¶ 40, 144; Delgado Dep. at 86-87, ECF No. 57-1. In the context of officers making inappropriate sexual comments, Sgt. Guzda allegedly told Plaintiff, "You're going to learn a lot about the male anatomy working here" and that by the time she left she would "know the entire male anatomy."  Delgado Aff. ¶¶ 45, 109.  A reasonable jury could infer from these alleged remarks that Sgt. Guzda knew that inappropriate sexual comments

regarding male anatomy were commonplace in Squad A and would continue throughout Plaintiff's tenure.  Similarly, given the close quarters of Squad A's offices, *see* Delgado Dep. at 81, ECF No. 57-1; Guzda Dep. at 82; Delgado Aff. ¶ 42, a reasonable jury could infer that Sgt. Guzda knew or should have known of Officer DiBella's alleged constant use of the terms "spic" and "guat" to refer to Hispanics.  *Id.* ¶ 109.  There is no evidence that Defendant took any remedial action with respect to the alleged offensive remarks.

Because Sgt. Guzda's conduct is not imputed to Defendant, what remains are the alleged incidents of Officer DiBella and others "constantly" making inappropriate sexual comments and derogatory remarks about Hispanics.  While this evidence is thin, the Court cannot conclude as a matter of law that Plaintiff's co-workers' conduct was not sufficiently severe or pervasive.

## V.   CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 54) is GRANTED IN PART AND DENIED IN PART.  Summary judgment is granted and judgment shall enter in Defendant's favor as to Plaintiff's claims for (i) disparate treatment on the basis of national origin under Title VII and CFEPA; (ii) disparate treatment on the basis of sex under Title VII and CFEPA; and (iii) retaliation under Title VII and CFEPA.  Summary judgment is denied with respect to Plaintiff's hostile work environment claim based upon her co-workers' inappropriate sexual comments and derogatory remarks about Hispanics.


SO ORDERED at Bridgeport, Connecticut this second day of November, 2015.


  /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE